**Kerry Douglas ARMSTRONG, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 68980.**

Court of Criminal Appeals of Texas, En Banc.

Nov. 27, 1985.

Rehearing Denied Oct. 22, 1986.

Curtis Pritchard, Ben Hill Turner, Cleburne, for appellant.

Dan M. Boulware, Dist. Atty., Wayne Bridewell & William G. Mason, Asst. Dist. Attys., Cleburne, Robert Huttash, State's Atty., and Alfred Walker, First Asst. State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

A jury convicted appellant of capital murder. Upon receiving the jury's affirmative answers to the two punishment issues, the court assessed punishment at death. See Art. 37.071, V.A.C.C.P. We abated the appeal so that the trial court could file findings of fact concerning the voluntariness of appellant's confession. Those thorough and extensive findings are now before us and we proceed to consider the appeal.[1]

Appellant challenges the legality of his arrest and subsequent confession. In or-

der to put his contention in the proper context we first set out the facts.

Charlie Maldonado, manager of Earl Williams grocery store in Cleburne, was shot to death on August 4, 1981. His body was found slumped on a lettuce crate in the produce freezer of the store at about 7:00 a.m. He had been shot three times, including two shots in the head.

Earl Williams, owner of the grocery store, testified that he had placed about $7600.00 in the safe in the store when he closed the store on August 3, 1981. The safe was found open and the $7600.00 missing on August 4, at about 7:00 a.m.

William Montgomery drove past the grocery store at about 6:35 a.m. on August 4. He saw Maldonado opening up the store, as usual, and also noticed a black male standing slightly behind Maldonado with a newspaper folded over his right wrist. The black male looked in both directions and took the newspaper off his arm. Montgomery saw something in his right hand but could not tell what it was. The black male was wearing a blue shirt, blue jeans, and something on his head. Montgomery testified that the black male could have been appellant, but that he was not positive.

Carolina Marbut passed by the grocery store at about 6:40 a.m. on August 4, 1981, on her way to work. She saw a black male run from the store carrying a brown paper bag in one hand. He was wearing a blue shirt, blue jeans, and something on his head. She could not identify appellant as that man.

Acting on an arrest warrant, Officer Robert Killinger arrested appellant about 11:00 p.m. on August 4, 1981. Appellant attacks his arrest, arguing that the affidavit supporting the arrest warrant does not contain underlying circumstances showing that the "informers" were credible and reliable.

W.D. Baker, a police officer for the city of Cleburne, appeared before Judge Joe Y.

---

1. Although ultimately we reverse the instant case we consider and decide several grounds of error because they are otherwise certain to be relitigated in the event of a retrial.

Post, a justice of the peace in Cleburne, and swore that,

> I have good reason to believe and do believe based upon the following information the affidavits of Lora Pollard, Caroline Marbut, Bob Gatlin and W.H. Montgomery which are attached hereto and incorporated herein ... that Kerry Douglas Armstrong on (or about) the 4th day of August, A.D. 1981, ... did intentionally and knowingly cause the death of an individual to wit: Charlie Maldonado by shooting him with a firearm....

The four statements attached to Baker's affidavit are unsworn statements. Pollard's statement is the most directly damaging to appellant. She listed a Cleburne address as her home and stated the following:

> On the night of July 28, 1981, I was at the Washateria on Brazos Street, Cleburne, Texas. Kerry Armstrong called me over to his car. It is a new model car, light green on the bottom and dark green on top. I got in the car with him and went to his house on Brazos Street by Curlee's filling station. It is a green and white house.
>
> We went in the house and we were talking and all of a sudden, he said he wanted me to go to bed with him. I would not do it and he knew I wouldn't so he pulled a pistol on me. I started trying to get him off the subject and then he started talking about how he was tired of working for white men and he was talking about Earl Williams and saying he was going to rob Earl Williams store. He said he was going to stay up all that night and be there when they opened the store and rob them when they opened and he didn't care who was there, that he would just shoot them and take all the money. He was also talking about moving out of Cleburne because everyone here knows his background, then he said that he just might stay here and get married. After all that talk, he still had the gun in his hand and he asked me if I was ready to get in bed with him and I was afraid of him because he said that if I didn't have sexual relations with him,

he would kill me and then kill himself, because he just didn't care. I told him that if that was what he wanted I would so we went to bed and he had sexual relations with me.

> After that, someone called him on the phone and he talked to them a little while. Then I told him I wanted to go home and he took me home.
>
> Nothing happened at the store the next morning and so I did not think anything else about it. I did tell my boyfriend, Arthur Rogers, what he had said and done, I told Arthur this on Friday July 31, 1981. This morning, August 4, 1981, Arthur called me and told me about Mr. Maldonado being killed up at Earl Williams' store and the store being robbed and I just know that Kerry Armstrong did it.
>
> Kerry Armstrong is about 5′5″, is fairly slight built, usually has a cap on his head which is a little round cap that fits down close to his head with a little short bill on it. It is not like those other caps with the big bills that everyone else wears. It is a tan color, tweed sort of material, and when he puts it on, it spreads out on his head.

Bob Gatlin, an employee at Earl Williams Grocery Store gave a statement saying that on August 4, 1981, he arrived at the store at 6:55 a.m. He saw Maldonado's pickup truck parked on the side of the store, as usual, and he went inside. He found Maldonado lying inside a walk-in cooler. He also saw Maldonado's keys beside the open safe. The money was missing from the safe.

Carolina Marbut worked for the Santa Fe railroad. In her statement she said that on August 4, 1981, at about 6:40 a.m., she drove by Earl Williams Grocery Store. She saw a pickup parked at the side of the store. As she passed the store, Marbut noticed a black male, between 17 and 25 years old, about 5′6″, slender build of about 135–145 pounds. He was wearing a blue, "uniform type" shirt, blue jeans, and a cap or hat. He was carrying a brown paper

sack in his hand as he ran from the front of the store and headed east, turning down the first street by the store. Marbut said all the lights in the store were on and she did not see anyone inside the store.

W.H. Montgomery, also an employee of the Santa Fe Railroad, stated that he drove by Earl Williams Grocery Store almost every morning on his way to work and that he usually saw Maldonado opening the door. On August 4, 1981, Montgomery drove by the store at about 6:35 a.m. and saw Maldonado opening the door. He also saw a black male standing behind Maldonado with a newspaper folded over his right forearm. Maldonado opened the door and as the two stepped inside the store Montgomery saw the black male pull the paper off his arm and saw something in his right hand. Montgomery could not tell what it was. Montgomery said the black male was wearing blue jeans and a dark blue shirt, had short hair, and was wearing a light colored object on his head that did not look like a regular hat or cap.

■ Appellant bases his contention of the insufficiency of the arrest warrant affidavits on the Fourth Amendment to the United States Constitution. He contends that since the aforementioned statements supporting the warrant were hearsay statements, the "veracity" or "reliability" prong of the Aguilar-Spinelli test had to be met and it was not. See *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). After submission of this case, the Supreme Court abandoned the standard two-prong test of *Aguilar-Spinelli* in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). While stating that "veracity," "reliability" and "basis of knowledge" are highly relevant in determining an informant's report, the Supreme Court said they are no longer separate and rigid requirements which must be met in determining probable cause. The "totality of the circumstances" approach which includes a consideration of the "veracity," "reliability" and "basis of knowledge" is now the standard to be used in evaluating probable cause in a commonsense, practical fashion.

■ In the instant case none of the four unsworn statements contain explicit statements of "veracity." However, three of the statements—Gatlin's, Montgomery's, and Marbut's—fall into the "identified bystander" or witness category in which courts have found an inherent reliability. All three simply describe events witnessed by disinterested citizens, not actual "informers" in the sense of undercover officers or those involved in criminal activity. They are all based on direct, personal observation or first-hand knowledge. Even under pre-*Gates* law these statements would be found to be reliable. See *Lopez v. State,* 535 S.W.2d 643 (Tex.Cr.App.1976); *Frazier v. State,* 480 S.W.2d 375 (Tex.Cr.App.1972); *United States v. McEachin,* 670 F.2d 1139 (D.C.Cir.1981) and cases cited therein at n. 4; *United States v. Bell,* 457 F.2d 1231 (5th Cir.1972).

Pollard's statement does not fit quite so easily into the bystander category. However, Pollard's statement relates a conversation with appellant which details the crime as far as exact location, time of day, method, and result. The only difference was the date—appellant told Pollard he was going to commit the robbery that morning, instead he committed it a week later. This fact does not detract from the accuracy of the statement as a whole. Examining the statement under the totality of the circumstances we find that Pollard's statement was corroborated by the facts of the crime itself, which police knew before Pollard gave her statement, and by the two other witness statements which described a man fitting appellant's description, who was seen entering and then running from the store in the early morning hours. Given these other statements and the facts of the offense, both of which corroborate Pollard's information we hold that Pollard's statement is reliable. After examining the totality of the circumstances, including the facts of the crime itself and the four statements, one of which names appellant and

details the facts of the crime very closely, we find a substantial basis for concluding that probable cause existed to believe that appellant had committed the offense. Cf. *Bellah v. State*, 653 S.W.2d 795 (Tex.Cr. App.1983). The ground of error is overruled.

Appellant next contends that his confession should not have been admitted into evidence because it was not voluntarily made under the guidelines of the Fifth and Fourteenth Amendments to the United States Constitution. Appellant does not base his contention on a violation of Article 38.22, V.A.C.C.P., thus, we will not address it.

Appellant, who was nineteen at the time, was arrested at about 11:00 p.m. on August 4. He was taken before a magistrate and advised of his rights at about 11:30 p.m. The magistrate, Judge Joe Post, testified that he asked appellant if he understood his rights and that appellant said he understood. Appellant was then taken to a small room in the criminal investigation division of the police department. Claude Zachary, chief of police for Cleburne and a man with twenty-two years of experience in law enforcement, questioned appellant for about an hour and a half beginning at about midnight on August 4. Zachary advised appellant of his rights before he began talking to him and told appellant he had been arrested for the robbery and murder of Charlie Maldonado.

Lieutenant N.H. Laceman, an officer with the Cleburne Police department, arrived at the police station and questioned appellant from about 2:00 to 3:00 a.m. on August 5. He and Zachary talked to appellant until 6:30 or 7:30 a.m. with several breaks in-between. They all ate breakfast, and resumed questioning for a little while. Appellant then agreed to go with them to Dallas to take a polygraph test. Zachary said appellant always answered their questions, talking about various aspects of the case. Many times he said he did not know or did not do it. Laceman said appellant never asked them to stop their questioning and never asked for a lawyer.

Laceman, Zachary, and appellant drove to Dallas for the polygraph test, returning to Cleburne about 4:00 or 5:00 p.m. Appellant was given dinner, and placed in a cell for the night.

Zachary said that he, Officer Robbie Goodnight, and Sergeant W.D. Baker questioned appellant off and on throughout the day on August 6, although none of them talked to him together. Goodnight said he advised appellant of his rights on August 6 before he spoke to him, and said that he only spoke to appellant for about forty-five minutes. Baker testified that he spoke to appellant four or five times the first few days appellant was in city jail, always reading him his rights first. Both Baker and Goodnight said that appellant was always willing to talk to them and that they were checking out what appellant told them and then informing appellant about what they had found. After about 5:00 or 6:00 p.m. appellant would be put back in his cell for the night.

Zachary testified that appellant was not questioned all the time. He talked to appellant almost every day, but not constantly, and often it was simply to tell him whether or not the information he had told the police had been correct. As mentioned several other officers spoke with appellant concerning information he had told them. During the time he was held in city jail appellant was permitted to telephone those people he requested to telephone, and he visited with his mother, sisters, and brother on several occasions.

On August 11, seven days after appellant's arrest, James Henry who was working on the case as a special investigator for the district attorney's office, saw appellant in the police station. Henry said he had known appellant for several years and was on a friendly basis with him. Appellant nodded to Henry and Henry acknowledged the greeting. Appellant then indicated that he wanted to talk to Henry and Henry read him his rights. Henry asked him about the money from the robbery, asked him if he knew who committed the offense and if he was involved. Appellant answer-

ed that he had the money and the money bags. Henry asked him what happened to the bags and appellant told him he would show him. Henry called Zachary and the three men got into an unmarked police car and drove to Earl Williams grocery store.

Zachary asked appellant to start from the scene of the crime and direct them as to the route he took after the robbery. Appellant showed them how he had hidden the money bags in a clump of grass, gone to his mother's house and gotten his car, and driven to a bridge or culvert near a sewage pond. He told Zachary to stop the car, that he was going to tell them everything, and that the gun was there. Zachary asked him if it was the gun he had shot Maldonado with and appellant said "yes." Henry retrieved the gun from under the bridge. Appellant then directed them to Fort Worth to get the money bags. Henry asked appellant about the offense and appellant told him he had put Maldonado into the freezer at the rear of the store. He said he walked back to see if he had locked the door and as he approached the door Maldonado kicked it open and the gun went off.[2]

Appellant directed Zachary and Henry to a manhole or drainage cover in a field. Henry and appellant climbed down into the tunnels of the drainage system and appellant showed him where he had burned checks stolen in the robbery. Henry picked up pieces of burned checks, some with the grocery store name stamped on them. He also found the money bags.

In response to questions about the location of the money, appellant directed them to his sister's house in Arlington. His car was parked in the locked garage at the house. He opened the trunk, looked inside and could not find the money. He told them that his sister, who was not at home, must have the money. The three then drove back to Cleburne, stopping on the way to eat lunch.

When they arrived at the police station, Zachary read appellant his rights from the top of a statement form. Appellant said he understood his rights. Mrs. Williams, a secretary at the police department, wrote appellant's statement down and then typed it. Zachary handed the typed statement to appellant, told him to read it and make any changes he wanted. Appellant read the statement, corrected something about blue jeans and shoes, and signed the statement. Zachary and Henry testified that no promises were made and that appellant freely, voluntarily, and knowingly waived his rights prior to making the oral and written statements.

Appellant contends that his confession was not voluntary because he was "extensively interrogated" for seven days by numerous people; that his conversations were covertly taped; that he was forced to take a polygraph in Dallas; that he was kept in a small holding cell or a small interrogation room with no way to determine if it were day or night; that he had limited access to his family; that he never saw a lawyer; and that he was treated differently than any other prisoner arrested by the Cleburne Police in that he was held at the city jail rather than being transferred to the county jail.

In response to these contentions the State points out several things. Officer Goodnight testified that he and Officer Baker hid a tape recorder in the interrogation room on one occasion. Appellant had implicated another man in the commission of the offense and the police brought this man in to talk to appellant while no one else was in the room. Goodnight said they had asked the district attorney's office about use of the recorder in this instance and the district attorney had informed them that the tape could not be used as evidence, but that they could use the tape for information purposes. No other conversation was recorded.

Concerning the reason appellant was held at the city jail from August 4 through August 14, Zachary testified that in his ten years as police chief no other prisoner had been held in the city jail as long as appel-

2. As shown infra, the medical testimony belies this statement.

lant, but that there were two reasons for holding him. First, the police were informed that relatives of the deceased had come to town and threatened appellant's life and the police believed the security at the city jail was better than that at the larger county jail. Second, prisoners were usually transferred when the investigation of their case was completed by the police and the investigation into appellant's case was ongoing. Zachary also testified that appellant was permitted to make telephone calls; that he saw his mother, sisters, and brother on several occasions; that after the night of his arrest he was never questioned after 5:00 or 6:00 p.m.; and that he was not continually interrogated, that he gave basic information to police, which was checked and then the results of which were reported to appellant. Zachary and the other officers said that appellant was always willing to talk with them, that he was informed of his rights repeatedly, and that he voluntarily and knowingly waived them.

The record indicates that appellant agreed to take a polygraph test and contains no hint of coercion or force in that decision.

We agree with appellant that "extensive interrogation" from August 4 to August 11 when he confessed would be suspect. However, the record of the Jackson-Denno[3] hearing does not substantiate that claim. Assuredly, appellant was questioned from the date of his arrest until he confessed on August 11. However, much of the questioning was apparently talking with appellant about the results of the investigation of the story appellant had volunteered, which investigation refuted appellant's story. While the questioning on the night of his arrest lasted for several hours, thereafter appellant was not questioned for longer than forty-five minutes to an hour at a time during the day. Appellant was permitted to visit with his family and use the telephone when requested.

Appellant did not testify at the hearing on the voluntariness of his confession. The trial court's extensive and thorough findings of fact conclude that the oral and written confessions were voluntarily given.

 The determination of whether a confession is voluntary under the due process clause of the Fourteenth Amendment to the United States Constitution must be based upon examination of the totality of the circumstances surrounding its acquisition. *Davis v. North Carolina*, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936); *Hawkins v. State*, 628 S.W.2d 71 (Tex.Cr.App.1982). Relevant circumstances to determine if a defendant's will has been overborne have included length of detention, incommunicado or prolonged interrogation, denying a family access to a defendant, refusing a defendant's request to telephone a lawyer or family, and physical brutality. See 1 W. LaFave & J. Israel, Criminal Procedure, Sec. 6.2 at p. 445 (West 1984). A defendant's characteristics and status, as well as the conduct of the police, are important concerns. *Turner v. Pennsylvania*, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949); *Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). Several pre-*Miranda* cases involved mentally retarded, mentally deficient or insane defendants. *Culombe v. Connecticut*, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); *Fikes v. Alabama*, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); *Clewis v. Texas*, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967).

██ In the instant case appellant was arrested August 4 and confessed August 11. Immediately following his arrest he was taken before a magistrate and advised of his rights. Throughout the course of questioning, appellant was repeatedly advised of his rights. The record does not indicate that appellant was mentally deficient. He was held at the city jail until August 14, longer than any other individual as far as any of the police officers could remember. However, he was not held incommunicado, but was permitted to make

---

**3.** *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

telephone calls when he requested to do so and was permitted to and did visit with different members of his family on several occasions. He was well-fed, was not questioned for prolonged periods of time after the night of his arrest, and never indicated a desire to stop the questioning or see an attorney. The officers testified that part of the reason for the prolonged stay in city jail was due to ongoing investigations of various stories relayed to them by appellant concerning the offense, many of which turned out to be false. Cf. *Columbe v. Connecticut,* supra, 367 U.S. at 580, 81 S.Ct. at 1866. Zachary testified that appellant was kept in the city jail because of threats made on his life and, as mentioned, because the investigation was continuing. Compare *Clewis v. Texas,* supra, in which the defendant was not advised of his rights, was not taken before a magistrate for 38 hours, had little sleep or food, appeared to be sick, and had little contact with anyone except police, and was interrogated intermittently by many officers for the purpose of getting "the truth." The coercive atmosphere presented in *Clewis v. Texas,* supra, and *Columbe v. Connecticut,* supra, is not presented in the instant case. Viewing the totality of the circumstances as mentioned, we find that the oral and written statements were voluntarily given by appellant. The ground of error is overruled.

Appellant contends that the evidence is insufficient to support an affirmative answer at the penalty stage of the trial to Special Issue No. 2 as to the probability of future criminal acts of violence. See Art. 37.071(b)(2), V.A.C.C.P.

The state reoffered the evidence from the guilt-innocence stage of trial and called several witnesses. The evidence adduced at trial showed that appellant had mentioned robbing and shooting whoever was in Earl Williams' grocery store one week before he actually did so. The record also showed that appellant and Maldonado knew each other. The pathologist's testimony showed that the wounds were contact wounds, meaning that the gun had been in contact with Maldonado's head when fired.

Appellant had twice placed the gun against Maldonado's head and fired it. Maldonado was apparently seated on a crate with appellant standing over him when he was shot. There was no sign of a struggle.

Several witnesses testified that appellant's reputation for being peaceful and law-abiding was bad. The vice-principal of the high school which appellant had attended testified that appellant's school record contained over eighty-five incidents of misconduct, which was more than usual. He said these included class disturbance, disrespectful conduct, refusal to follow orders given, forgery, and one incident of fighting.

David Brunson, who worked at the Santa Fe railroad with appellant, said that appellant told him he had a .38 caliber pistol and that he had had a problem in Fort Worth and a Mexican or Puerto Rican had shot at him and he had shot back.

The State also put on evidence that appellant was found in possession of a car stereo two days after the car had been burglarized and the stereo stolen. Appellant's explanation of where he had gotten the stereo was found to be false.

Numerous witnesses called by the defense testified that they had grown up with appellant, knew him well, did not consider him a threat, and did not consider him to be violent. They also said that his reputation for being peaceful and law-abiding was good and that they had been shocked when they heard appellant was accused of killing and robbing Charlie Maldonado.

Appellant did not testify.

The State called Larry Duvall who was an inmate of the county jail at the same time appellant was there which was after appellant's arrest for Maldonado's murder. Duvall said that during the twenty days in which he was in jail with appellant, appellant assaulted him and several other inmates on four or five occasions. Duvall said appellant was a leader in the jail and took his money and his food. He claimed that appellant told him he wanted to sexually abuse him. Duvall was in jail for

felony theft by check and was currently on probation for forgery. At the time he testified the theft case was still pending. Duvall said the district attorney told him that his testimony would not have any effect in his pending case.

■ Circumstances of the offense itself can sustain an affirmative answer to Art. 37.071(b)(2). *Russell v. State*, 665 S.W.2d 771 (Tex.Cr.App.1983); *Mitchell v. State*, 650 S.W.2d 801 (Tex.Cr.App.1983); *King v. State*, 631 S.W.2d 486 (Tex.Cr.App. 1982). In the instant case, the evidence suggests premeditation and planning as appellant told someone he was going to commit the offense, although he committed a week later than he had originally said. The medical evidence indicates a deliberate and cold-blooded murder during a robbery of a man who knew appellant and whom appellant knew. The medical testimony indicates that Maldonado was seated on a crate and that appellant placed the gun at his head on two separate occasions and shot him. There was also testimony that after being confined in the county jail appellant assaulted several inmates. There was also testimony that appellant's reputation for being peaceful and law-abiding was bad.

When the facts of the instant offense are considered with the evidence of the assaults while in jail after the offense, and appellant's reputation, we find the evidence sufficient to sustain the jury's affirmative answer to the second special issue. See *Russell,* supra; *Mitchell,* supra; *Russell v. State*, 598 S.W.2d 238 (Tex.Cr.App.1980). The ground of error is overruled.

Appellant argues that the trial court erred in permitting Eva Maldonado, the deceased's wife, to testify in rebuttal at the punishment stage of trial.

The State called Eva Maldonado to testify that the deceased was a peaceful, hardworking man. Prior to her testimony, appellant objected, stating that such testimony was not rebuttal and was not invited by the defense. The court overruled the objection. Eva Maldonado testified that the deceased was a peaceful, hardworking man

and that she and the deceased had been married almost twenty-two years and had five children. The State introduced a family picture of the Maldonados and elicited the names and ages of all the children.

■ Appellant is correct in stating the rule:

It is never competent for the State in the first instance to prove that the person slain was peaceable and inoffensive. Such evidence becomes admissible in rebuttal when the opposite has been testified to in behalf of the defense, or when the defendant seeks to justify the homicide on the ground of threats made by the deceased.

*Arthur v. State*, 170 Tex.Cr.R. 161, 339 S.W.2d 538, 539 (1960). See *Lamb v. State*, 680 S.W.2d 11 (Tex.Cr.App.1984) wherein the rule is applicable to capital murder.

■ At the guilt-innocence stage appellant rested without calling a single witness. At the punishment stage appellant's witnesses testified that appellant's reputation for being peaceful and law-abiding was good and that appellant was not a threat. Appellant did not raise an issue or present any evidence about the violent nature, or lack thereof, of the deceased. Evidence that appellant's reputation for being peaceful and law-abiding was good does not, by itself, raise an issue that the deceased reputation for the same was bad. Thus, nor does it, by itself, permit the State to then introduce evidence concerning the deceased's reputation for being peaceable. *Arthur,* supra. Appellant did not present a defense or allude to the deceased in any way. Further, neither appellant nor any witnesses testified as to any provocation.

We agree with appellant that the issue of the deceased's character for being peaceable and law-abiding was not raised by the evidence, thus the rebuttal testimony of Eva Maldonado was inadmissible. *Hatley v. State*, 533 S.W.2d 27 (Tex.Cr.App.1976). There was nothing to rebut. The obvious purpose therefore, in calling the wife of the deceased *in rebuttal* as the last witness the jury heard at the punishment stage,

was to arouse and inflame the jury against appellant. The harm is compounded in the instant case where, although we find it sufficient, the evidence supporting special issue No. 2 is by no means overwhelmning. The prejudicial effect of such testimony is thus greater.

The testimony was not relevant to either of the two special issues presented to the jury. Where, as in the instant case, such testimony has no other purpose than to inflame the jury and arouse their sympathy at the punishment stage of a capital murder trial, the error is harmful and the case must be reversed.[4] Accordingly, this case is reversed and remanded for a new trial.

TEAGUE, J., concurs in result.

MILLER, CAMPBELL and WHITE, JJ., dissent.

Before the court en banc.

### OPINION ON STATE'S MOTION FOR REHEARING

TOM G. DAVIS, Judge.

This is an appeal from a conviction for capital murder. V.T.C.A., Penal Code, Sec. 19.03(a)(2). Punishment was assessed at death. On original submission this Court reversed the conviction because the trial court allowed inadmissible evidence to be brought before the jury over appellant's objection. We granted the State's motion for leave to file a motion for rehearing to review this holding.

The evidence in question is the testimony given by the deceased's widow, Eva Maldonado. Mrs. Maldonado was called by the State in rebuttal during the punishment phase of trial, over appellant's objection that her testimony would not be proper rebuttal. We will first examine the evidence presented by appellant, to see exactly what the State was attempting to rebut.

Appellant called no witnesses on guilt-innocence. During the punishment phase, however, appellant called ten witnesses. Most testified that they had known appellant all his life. All the witnesses testified that they had never known appellant to be violent or to carry a gun. They were shocked when they heard he had been arrested for capital murder. The final defense witness was appellant's mother. She testified that appellant had always been quiet and nonviolent, had helped her financially, and that she did not consider him a threat. She concluded her testimony with an emotional plea to the jury to spare appellant's life.

In rebuttal the State called Larry Duvall, who had been an inmate with appellant in the county jail while both were awaiting trial. Duvall testified that appellant had assaulted him and two others and was both a ringleader and an instigator of violence in the jail.

The State then called Eva Maldonado. Appellant's objection[1] was overruled and Maldonado testified as follows:

"Q. [by the prosecutor] What was your husband's name?

"A. Charlie Levi Maldonado.

"Q. When were you married to Charlie?

"A. Um, we were going to be married twenty-two years uh, December the 15th.

"Q. Did you and he have children?

"A. Yes.

"Q. Are they still living?

"A. Yes.

"Q. What are their names?

"A. Charlie Junior, and Debbie, Brenda, and Timmy and Tammy.

"Q. Was Charlie a hard-working man, Eva?

"A. Yes.

"Q. What kind of work did he do?

"A. He was a, a store manager.

---

4. Because of our disposition of this case we need not address appellant's remaining contentions.

1. Appellant's objection is fully set out infra in our evaluation of the State's claim of an untimely objection.

"Q. Did he work all your life that you were married to him?

"A. Yes, he never missed a day's work even if he was sick. He never missed a day's work, never.

"Q. Was he a good father to these children?

"A. Yes. I mean, my kids couldn't ask for a better daddy.

"Q. Was he a good husband to you?

"A. Yes.

"Q. Was he a peaceful—

"A. Yes.

"Q. —person?

"A. He was a real nice person. He was real nice to everybody. I mean, white, Spanish, colored. He was a real nice man to everybody.

"Q. Did he have a lot of friends?

"A. Oh, yes."

Mrs. Maldonado then identified two photographs. The first showed the deceased with his wife and children, and the second was of the deceased with his wife. These were admitted into evidence over appellant's objection. She further testified as to the work hours of the deceased and that no gun was kept in the store as far as she knew. Finally, she testified as to the age of the deceased on the date of the offense, the ages of their five children, and which ones were still attending school. Appellant did not cross-examine her, and the State and defense rested.

This Court on original submission held that the admission of this testimony constituted reversible error because the appellant had not first introduced any evidence as to the character of the deceased. We said:

"Appellant is correct in stating the rule: "It is never competent for the State in the first instance to prove that the person slain was peaceable and inoffensive. Such evidence becomes admissible in rebuttal when the opposite has been testified to in behalf of the defense, or when the defendant seeks to justify the homicide on the ground of threats made by the deceased.

"*Arthur v. State,* [170 Tex.Cr.R. 161] 339 S.W.2d 538, 539 (Tex.Cr.App.1960). See *Lamb v. State,* 680 S.W.2d 11 (Tex. Cr.App.1984) wherein the rule is applicable to capital murder."

█ The State argues[2] that *Lamb,* supra, did not apply this rule to capital murder prosecutions. We disagree. In *Lamb,* supra, the defendant being tried for capital murder contended that he had killed the deceased in response to an offensive homosexual advance made by deceased. To support this allegation the defendant introduced into evidence a document in deceased's travel bag that alluded to a gay rights organization. In rebuttal the State offered into evidence deceased's job resume and travel receipts, to rebut the defendant's allegations that deceased was homosexual and that there was any previously existing relationship between the defendant and the deceased. This Court held that such evidence was admissible in rebuttal because the defendant had placed the deceased's character in issue. The Court distinguished *Clark v. State,* 158 Tex.Cr.R. 180, 254 S.W.2d 106 (Tex.Cr.App.1953), holding that *Clark* "did not ... disavow the notion that evidence of whether a deceased in a murder case was a person of violent or dangerous character, or a person of kind and inoffensive disposition, would be admissible *where warranted.*" 680 S.W.2d at 16 (emphasis added). The *Lamb* opinion further advised the reader to "see also *Hatley v. State,* 533 S.W.2d 27 (Tex. Cr.App.1976)." *Hatley,* supra, quotes the same rule from *Arthur,* supra, quoted above and in our opinion on original submission, to the effect that the State may not introduce evidence of the deceased's good character unless that character has somehow been placed in issue by the defendant. We hold, therefore, that this rule is applicable to cases of capital murder.

---

**2.** Both the district attorney and the State Prosecuting Attorney have filed briefs in support of the motion for rehearing. Because several of their respective arguments overlap, they will be discussed together.

■ The State next argues that the evidence of the deceased's peaceful character bears directly on special issue number three, as provided in Art. 37.071(b)(3), supra,[3] and therefore, had this special issue been submitted to the jury, then the evidence of the deceased's character would have been relevant and admissible. Since the State could not have predicted whether the appellant would later request the third special issue, the argument goes, then the State necessarily was required to put forth the disputed evidence to address that special issue. We disagree with this analysis. In a capital murder trial, evidence regarding provocation by the deceased must be raised by the facts of the case and cannot be anticipatorily rebutted by the State by introducing evidence as to the peaceful character of the deceased, on the mere speculation that the defense may request such a special issue. A contrary holding would completely do away with the rule that the State is barred from bringing forth evidence of the peaceful nature of the deceased until the defendant puts the character of the deceased into issue, see *Arthur,* supra, as the State could always subsequently argue that such evidence was submitted in anticipation of the special issue of provocation. The State may not introduce otherwise inadmissible evidence in order to rebut an issue that has not been raised.

The State further argues that the defense witnesses raised the issue of provocation through their testimony as to *appellant's* peaceful and law-abiding nature. The State argues that this evidence "created a strong implication that the deceased's character at the time of the shooting must have invited or affected the appellant's conduct." We hold that this evidence did not raise the issue of provocation.

To hold otherwise would require the submission of the issue of provocation to the jury every time the defendant wished to introduce favorable character evidence. As stated above, the issue of provocation must be supported by the facts of each case. The issue was not raised in the instant case. The State's medical evidence showed that the deceased had been shot in the back of the head while he was sitting on a crate. Furthermore, the State's witness Laura Pollard testified that a week before the offense appellant told her he was going to commit a robbery at the store and would kill "anybody" who "got in his way." There was no indication that appellant committed the murder in response to provocation. At the time of the bench conference before Eva Maldonado was allowed to testify, defense counsel asserted that the provocation issue had not been raised and that the defense would not request the third special issue be submitted to the jury. The trial court agreed that the issue had not been raised by the evidence. We also agree. Mrs. Maldonado's testimony was not admissible on this basis.

There was no evidence of any dispute, violent or otherwise, between appellant and deceased, as there was in, e.g., *Lamb,* supra. There was therefore no occasion for the type of rebuttal testimony given by Mrs. Maldonado. Furthermore, her testimony went beyond vouching for the peaceful and law-abiding nature of her late husband. She testified that the deceased was hard-working, a good husband and father, and had many friends, and her identification allowed the State to place before the jury pictures of the deceased with his family. As this Court said in a similar case of a widow testifying, "There can be no doubt that this testimony had no bearing whatso-

---

**3.** Art. 37.071(b) provides:

"On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:

"(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

"(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

"(3) *if raised by the evidence,* whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased."
(emphasis added)

ever on any material issue in the case and its sole purpose was to inflame the minds of the jury." *Vela v. State*, 516 S.W.2d 176, 179 (Tex.Cr.App.1974). See also the many cases cited therein. *Id.*

The only character appellant put in issue through his witnesses was his own. The testimony of the State's first rebuttal witness as to appellant's conduct in jail went properly to that issue. Evidence of appellant's peaceful and law-abiding character does not, however, automatically implicate the character of the *deceased*. Mrs. Maldonado had no testimony to offer as to the character of appellant. Her testimony was not rebuttal. Therefore it was error to allow this testimony. If preserved, it was reversible error.

■ Error of this type may be waived if the objection is insufficiently specific, *Vela*, supra at 178, or untimely made. Objection to the introduction of the evidence must be made at the earliest opportunity. *Montelongo v. State*, 681 S.W.2d 47, 57 (Tex.Cr. App.1984). The objection must be made as soon as the ground for the objection becomes apparent. *Thompson v. State*, 691 S.W.2d 627, 635 (Tex.Cr.App.1984). In the instant case appellant met both these criteria.

As soon as the State called Eva Maldonado as a rebuttal witness appellant objected and the following colloquy ensued among the trial court, the State's attorney, and the two defense attorneys. The jury was removed during the lengthy exchange.

"MR. MacLEAN [prosecuting attorney]: Your honor, the State proposes to put on Mrs. Maldonado briefly to identify a picture of her husband, the deceased, to let the jury know who her five children are.

"THE COURT: That's not rebuttal. John, that's no form or fashion of rebuttal.

"MR. MacLEAN: In addition to that, Your Honor, there's been testimony about his good reputation, that he's been a peaceful and law-abiding citizen.

"THE COURT: Who? 'He' who?

"MR. MacLEAN: The Defendant. Mrs. Maldonado is aware that her husband had been robbed on a prior occasion, and that there was not a gun in the store, and that they had discussed the robbery, and that he had stated words to the effect, or she had stated to him, 'Just let them have it,' and don't contest the assailant.

"MR. PRITCHARD [attorney for appellant]: Judge, I don't see where that's rebuttal.

"MR. MacLEAN: I think it's highly relevant in light of what they have shown, that they have tried to show he's such a peaceful and law-abiding citizen through their character witnesses. The man here that he shot was a peaceful man and not a violent man.

"MR. PRITCHARD: Not a question about that.
" * * * *

"MR. MacLEAN: I think that has direct bearing in the way of rebuttal to the testimony they have put on that he's just a very peaceful, quiet, little person that wouldn't harm anybody. Well, the character of the person who was killed in this case, the fact that he's not violent and wouldn't be the type that would combat an assailant who came into the store that robbed him, the fact that he had been robbed before and let them have what they came after is relevant to what they are trying to portray to the jury their client is like.

"THE COURT: Perhaps within some minor limits, but it's not going to some speech about some previous attempted robbery and discussion about anything the deceased said to her.

"MR. MacLEAN: That's correct, Judge.

"THE COURT: But not any mention whatsoever of some attempted robbery or something three months before. It has nothing to do with this case. That's highly improper.

"MR. PRITCHARD: Judge, also, we brought forth no evidence at all as to Mr. Maldonado.

"THE COURT: You brought forth evidence about his good character and so forth. That raises some indicia of what they're talking about.

" * * * *

"MR. PRITCHARD: It raises something about Mr. Maldonado's character?

"THE COURT: Yes, sir, in a way it does. He got killed in this episode.

"MR. PRITCHARD: I understand that, Judge. She doesn't know anything about [appellant]. She can't testify about him. The only thing we brought up is whether or not he was a peaceful and law-abiding citizen. She can't testify about it.

"MR. TURNER [defense counsel]: This is rebuttal. That's all it is.

"MR. MacLEAN: We have a right to put her on at this time for those limited purposes.

"THE COURT: Within mind what I said, what do you purpose [sic] to offer? We're not going to hear anything about any other robbery or anything that bears on it.

"MR. MacLEAN: All right, Judge. We're going to offer that he was a peaceful man, that she was his wife. He was not a combative man.

"THE COURT: All right.

"MR. MacLEAN: He was a good husband and a good father, and introduce a picture of her and the children, and her introduce the children, and sit down.

"THE COURT: No introducing the children. That's out.

"MR. PRITCHARD: What about the picture, Judge?

"THE COURT: The picture's all right. And it will be limited to that, or I'll inject the Court's instruction to stop it right there. Limit it strictly to that.

"MR. PRITCHARD: If that's the case, Judge, let us enter an objection to Mrs. Maldonado's testimony because we feel it's not in rebuttal to anything, and it's improper for her to testify at this time.

"MR. TURNER: Even for this limited purpose. There's been no evidence.

"MR. PRITCHARD: There's been none raised about Mr. Maldonado's character.

"MR. TURNER: There is a proper time the State could have done this, and we don't feel it's in rebuttal to anything.

"MR. PRITCHARD: As far as the third question he talked about, we haven't asked the third question be done. And we'll tell the Court right now that we're not going to. So it has no bearing on the question.

"MR. TURNER: No evidence on it.

"THE COURT: I know you haven't raised it.

"MR. PRITCHARD: I know it.

"THE COURT: Bring the jury in, sir. Bring the jury back in.

"MR. TURNER: Is that objection overruled, Your Honor?

"THE COURT: Yes, sir. After I explain here, you gentlemen I think understand what the Court is going to allow him to go into. Nothing else."

▬ The State cites several cases[4] in which nothing was presented for review because the defendant did not make his objection to certain testimony until after the testimony had already been adduced. In the instant case, however, appellant objected to the testimony of the widow of the deceased as soon as she was called as a State's witness, before she had offered a word of testimony. The objection was lengthy, specific, and correct: that the deceased's character had not been placed in issue by the defense witnesses, and that Mrs. Maldonado could not rebut the defense evidence that *had* been offered, as to *appellant's* character. As defense counsel said of the proffered testimony, "[I]t's not in rebuttal to anything, and it's improper for her to testify at this time." Furthermore, counsel was careful to obtain an adverse ruling to his objection. The objection was both timely and specific enough to preserve the error.

---

**4.** E.g., *Marini v. State,* 593 S.W.2d 709, 716 (Tex. Cr.App.1980); *Corley v. State,* 582 S.W.2d 815, 821 (Tex.Cr.App.1979); *Witherspoon v. State,* 486 S.W.2d 953, 955 (Tex.Cr.App.1972).

Finally, the State argues that no reversible error is presented because the same evidence was admitted elsewhere without objection from appellant. *Boles v. State,* 598 S.W.2d 274, 279–80 (Tex.Cr.App.1980). The evidence of the deceased's good character to which the State refers was adduced during direct examination of one State's witness and during cross-examination of five defense witnesses. On direct examination the State asked its witness Barbara Overton:

"Q. Did you know Charlie Maldonado during his lifetime?

"A. Yes.

"Q. Was he a good man?

"A. He was to me."

This was the extent of her testimony concerning the deceased. When appellant called his ten character witnesses on punishment, the State cross-examined five of them concerning the deceased. The cross-examination of Lofton Scott is typical:

"Q. Did you know his family, Charlie's family?

"A. I saw his wife and seems like two boys.

"Q. With reference to Charlie, you saw him there in the store from time to time; did you not?

"A. Yes.

"Q. Was Charlie nice?

"A. Yes, sir.

"Q. Was he always nice to you?

"A. Yes, sir.

"Q. Did he have a reputation of being nice to people over there?

"A. Yes, sir."

The cross-examination testimony of the other four witnesses was to the same effect. They knew the deceased because they were occasional customers of the store he managed, and in that capacity he always treated them well. The defense made no objection. The State now argues that because appellant failed to object to this testimony, the admission of the testimony from deceased's widow is harmless.

To determine whether this testimony constitutes the "same evidence," we shall examine cases in which this waiver rule has been applied. In *Boles,* supra, the evidence complained of was a ballistics report used by the State to link the defendant to the gun used to kill the deceased. The evidence that had come in without objection was testimony from two witnesses that shortly after the shooting the defendant had told them she had shot the deceased. Further, the defendant herself identified the pistol as the one she had taken into the deceased's home, and with which deceased was shot. 598 S.W.2d at 279.

*Brasfield v. State,* 600 S.W.2d 288 (Tex.Cr.App.1980), was a capital murder prosecution. The defendant's former lawyer was improperly allowed to testify that the defendant had been in Lubbock, where the murder took place, at the time of the offense. This testimony was merely cumulative, however, and not reversible error, because "many other witnesses" testified that they had seen the defendant in Lubbock at the time of the offense. 600 S.W.2d at 296.

In *East v. State,* 702 S.W.2d 606 (Tex.Cr.App.1985), another capital case, the testimony admitted over defense objection was that the defendant had committed an extraneous narcotics offense shortly before the offense for which he was tried. No reversible error was presented because another witness had already testified without objection to the same fact. *Id.* at 611.

*Nethery v. State,* 692 S.W.2d 686 (Tex.Cr.App.1985), involved a prosecution for the capital murder of a police officer. The slain officer's partner was allowed to testify over objection that he heard another witness tell his partner that she had been raped by the defendant. The error, if any, was harmless because the witness herself had already testified without objection that she had told the officer the defendant had raped her.

In each of these cases this Court applied the rule that the admission of inadmissible evidence will not constitute reversible error where the "same facts" have

come into evidence through other testimony without objection. The State urges that the rule applies to the instant case. We disagree. We cannot agree that the testimony adduced by the State that the deceased was a nice man who treated his customers with respect constitutes the same evidence as the testimony given by Mrs. Maldonado that the deceased was a kind, hard-working man, a good husband, and the best possible father to their five children. On original submission we said that the error was in admitting her testimony at all, when its "obvious purpose ... was to arouse and inflame the jury against appellant." Certainly in its effect on the jury the testimony of witnesses who were only business acquaintances of the deceased's that he was nice to them could not have nearly the inflammatory power of his now-widowed wife's identifying a photo of the deceased with herself and their five now-fatherless children. The very placing of the widow on the stand represented an emotional appeal to the jury that had no relevance to the two special issues that the jury was called upon to answer. The glancing testimony of the other witnesses to deceased's niceness cannot be considered "the same facts"; nor was it of remotely the same emotional caliber as Mrs. Maldonado's testimony, in terms of likelihood of inflaming the jury's emotions. The earlier testimony did not, therefore, render the admission of Mrs. Maldonado's testimony harmless.

The State called the widow of deceased as a rebuttal witness. She testified, though, only to her husband's good character, which had not been placed in issue by appellant's punishment witnesses. Her testimony was irrelevant to any issue before the jury and was not proper rebuttal. Appellant made timely and specific objection to the testimony. Earlier testimony as to the deceased's respectful treatment of customers did not constitute the same evidence so as to render the error of admitting Mrs. Maldonado's testimony harmless. Having rejected the State's arguments, we adhere to our opinion on original submission.

The State's motion for rehearing is denied.

MILLER, CAMPBELL and WHITE, JJ., dissent.