COURT OF APPEALS













COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL PASO, TEXAS

 

JAVIER MADRID,                                               )

                                                                              )              
No.  08-04-00279-CR

Appellant,                          )

                                                                              )                    Appeal from the

v.                                                                           )

                                                                              )                
346th District Court

THE STATE OF TEXAS,                                     )

                                                                              )           
of El Paso County, Texas

Appellee.                           )

                                                                              )               
(TC# 20030D02109)

                                                                              )

 

 

O
P I N I O N

 

Javier Madrid
appeals his conviction for murder.  A
jury found him guilty and sentenced him to 60 years=
imprisonment and a $10,000 fine.  Here,
he raises three issues arguing that the trial court:  erred in admitting testimonial hearsay
evidence in violation of his right to confrontation; erred in admitting his
written confession because it was involuntary and obtained by coercive methods;
and erred by failing to make sufficient findings of fact and conclusions of law
regarding the voluntariness of his confession. 
We affirm.








In the early
morning on April 26, 2002, Gabriel Carrillo was fatally shot while parked at a
car wash.  Witnesses saw a Ford Bronco
leaving the scene after the sound of gunshots. 
In February 2003, the police received a Crime Stoppers tip about the
murder, which provided detailed information as to who was the killer, where the
murder weapon was located, and the vehicle used in the shooting.  Specifically, the tip alleged that Arturo
Madrid, Sr. pawned the weapon at a Cash America and Appellant, his son, had
committed the murder.  In addition, the
tip gave the license plate number of the Ford Bronco allegedly used in the
offense.  Detective Arturo Ruiz followed
up on the information and confirmed that Arturo had pawned a .357 magnum
caliber revolver at the Cash America pawn shop. 
Ballistics tests established that bullet fragments recovered from the
victim were fired from the gun.  DNA
analysis showed that the blood found on the gun also matched that of the
victim.  With regard to the information
on the vehicle, Detective Ruiz verified the vehicle registration and ownership
and learned that it was registered to Arturo Madrid, Sr.  Further investigation revealed that several
members of the Madrid
family, including Appellant, had access to the gun and drove the vehicle.

On March 6, 2003,
Appellant was found on McRae, pushing a Ford Bronco, and was arrested for
outstanding traffic warrants.  When
Detective Robert Posada arrived, Appellant was already in the backseat of the
patrol car.  Detective Posada took
Appellant out of the car, uncuffed him, handed him a Miranda card, and asked
him to read it.  After Appellant finished
reading the card, Detective Posada asked him if he understood his rights and
Appellant said that he did.  Appellant
signed and initialed the warning card. 
Detective Posada then advised Appellant that he would be taken to Crimes
Against Persons (ACAP@) office to talk about his vehicle
being involved in another offense. 
Subsequently, Appellant=s
wife, Maribel Martinez, voluntarily accompanied detectives to the CAP
office.  Other members of Appellant=s family were also interviewed separately
at the CAP office.  Arturo Madrid, Sr.
gave a statement in which he said the gun belonged to Appellant, but that
Appellant kept it in his house for two months. 
At trial, Mr. Madrid,
Sr. denied having any knowledge of the murder.








At the CAP office,
Detective Ruiz uncuffed Appellant and told him his Miranda rights again.  After indicating that he understood his
rights, Appellant began speaking with Detective Posada.  At first, Appellant denied any knowledge of
the murder.  Detective Posada then
revealed to Appellant that the gun had been recovered, that the victim=s blood was found on the gun, that
Appellant=s father
had pawned the gun, that a surveillance camera showed a Bronco and the victim=s Camaro at the scene, and ballistics
tests showed a match between the pawned gun and the bullet fragments recovered
from the victim=s
body.  After Appellant was shown a
photograph of the victim and was told that his father might be a suspect in the
crime, he confessed to shooting the victim. 
Appellant then agreed to give a statement.

In his statement,
Appellant stated that on the morning of April 26, 2002, he left work at 1:30
a.m. and was driving his father=s
Ford Bronco.  On the way home, the victim
drove up next to him in a Camaro.  The
victim kept looking at Appellant and Awas
talking shit@ and
moving his arms at him.  This continued
as Appellant drove further down the road. 
The victim started to point toward a car wash, telling Appellant to turn
into the car wash.  Appellant followed
the victim to the car wash and parked next to him.  Once he stopped, Appellant grabbed the .357
revolver that was underneath the driver=s
seat, approached the victim, and shot him twice from three feet away.  Appellant then got back into the Bronco,
reversed, hit a wall, and drove off.  The
following day, Appellant told his brother Arturo that he had shot
somebody.  He later had his father pawn
the gun at Cash America.








On the morning of
March 7, 2003, Detective Joe Baca interviewed the Appellant=s brother, Arturo Madrid, Jr.  Mr. Madrid,
Jr. was cooperative and voluntarily gave a statement.  Detective Baca learned from the interview that
Appellant told him about the shooting and that his  brother had kept the gun at his house for two
weeks.  Afterwards, Mr. Arturo Madrid,
Jr. took the police to his former residence where they found buried in the
backyard six spent shell casings from the gun.

In Issue Two,
Appellant contends that the trial court erred in admitting his alleged written
confession because it was involuntarily given. 
Specifically, Appellant asserts that the confession was obtained in a
coercive manner which offends due process, was not videotaped or tape-recorded,
and was based on mere allegations by the State.

We review the
trial court=s ruling
on a motion to suppress for an abuse of discretion.  Guzman v. State, 955 S.W.2d 85, 88‑9
(Tex.Crim.App. 1997).  Under this
standard, we give almost total deference to the trial court=s determination of historical facts
supported by the record, especially when the findings are based on an
evaluation of credibility and demeanor.  Id. at 89.  We review de novo mixed questions of
law and fact that do not turn on an evaluation of credibility and
demeanor.  Id.; Balentine v. State, 71
S.W.3d 763, 768 (Tex.Crim.App. 2002). When the trial court does not make
explicit findings of fact, we review the evidence in a light most favorable to
the trial court=s
ruling.  Carmouche v. State, 10
S.W.3d 323, 327‑28 (Tex.Crim.App. 2000). 
The trial court=s
ruling will be upheld if it is reasonably supported by the record and is
correct on any theory of law applicable to the case.  State v. Ross, 32 S.W.3d 853, 855‑56
(Tex.Crim.App. 2000).








The voluntariness
of a confession is determined by considering the totality of the circumstances
under which the statement was obtained.  Creager
v. State, 952 S.W.2d 852, 855 (Tex.Crim.App. 1997); Penry v. State,
903 S.W.2d 715, 744 (Tex.Crim.App. 1995), cert. denied, 516 U.S. 977,
116 S.Ct. 480, 133 L.Ed.2d 408 (1995). 
The ultimate question in determining voluntariness of the statement is
whether the defendant=s
will was overborne.  See Creager,
952 S.W.2d at 856, citing Armstrong v. State, 718 S.W.2d 686, 693
(Tex.Crim.App. 1985).  Factors in
determining whether the defendant=s
will was overborne include:  length of
detention; incommunicado or prolonged interrogation; denying access to a family
member; refusing a defendant=s
request to telephone a lawyer or family member; and physical brutality.  Pace v. State, 986 S.W.2d 740, 747
(Tex.App.--El Paso 1999, pet. ref=d).

The trial court
conducted a hearing on Appellant=s
motion to suppress his written statement. 
Detective Posada testified that in the course of investigating the car
wash murder, he received an anonymous tip from Crime Stoppers, which alleged
that Appellant shot the victim and had used his father=s
Bronco in committing the crime.  The tip
also alleged that Appellant=s
father had pawned the murder weapon. 
Detective Posada located and retrieved the gun.  Subsequently, ballistics tests established
that the bullet fragments recovered from the victim=s
body had been fired from the retrieved gun and DNA analysis showed that blood
found on the gun matched that of the victim. 
Detective Posada requested assistance from the ROP unit to start
surveillance on Appellant.  On March 6,
2003, Appellant was arrested for outstanding traffic warrants while pushing the
Bronco, which had stalled on the road.








When Detective
Posada arrived at the scene of arrest, Appellant was sitting in the back seat
of the patrol car.  He uncuffed
Appellant, handed him a Miranda warning card, and walked him over to the front
of the patrol car.  The detective asked
Appellant to read the card.  Appellant
said he could read English and after he finished reading the card, Detective
Posada asked Appellant if he understood it and Appellant said that he did.  Appellant signed the card.  Detective Posada then told Appellant that he
was under arrest for traffic citations and was going to be transported to the
CAP office because the detectives were investigating a crime involving the
Bronco.  After learning that Appellant
was married and where his wife was located, Detective Posada handcuffed
Appellant and placed him back into the patrol car.

While Appellant
was being transported to the CAP office, Detectives Posada and Ruiz went to the
home of Maribel Martinez, Appellant=s
wife.  Once there, the detectives told
her that Appellant had been arrested for the traffic tickets and that they were
investigating a separate crime.  They
asked her if she was willing to go to the CAP office to speak with them.  Ms. Martinez requested a ride to the CAP
office and voluntarily accompanied the detectives after placing her
one-month-old baby in her mother=s
care.








Appellant was
already at the CAP office when the detectives arrived with Ms. Martinez.  Detective Ruiz placed Appellant in the
interview room while Detective Posada escorted Ms. Martinez to a cubicle
to speak with her.  After speaking with
Ms. Martinez, the detectives entered the interview room where Appellant was
being held.  Detective Ruiz removed the
handcuffs and gave Appellant his Miranda rights again.  Appellant said he understood his Miranda
rights and waived those rights.  The
detectives told Appellant that they were investigating a crime and informed
Appellant that they had located the gun, that the gun positively matched the
bullet fragments found in the victim, and that the victim=s DNA was found on the gun.  The detectives also told Appellant that the
Bronco was believed to be involved and that Appellant=s
father was being looked into as a suspect because he had pawned the gun.  Appellant explained that his father had
pawned the gun for rent money.  Appellant
was then shown a photograph of the victim and was asked if he knew who he
was.  Appellant responded no and the detectives
again told Appellant that because his father had pawned the gun, there was a
possibility that his father Acould
get in trouble for this . . . .@  At that point, Appellant started telling the
detectives that he was the one that had shot the victim and told them what had
happened.  Appellant then agreed to give
a statement and was escorted to Detective Posada=s
cubicle.

According to
Detective Posada, the interview lasted about one hour and at no point did
Appellant request an attorney or ask to cease the interview.  Detective Posada testified that he did not
coerce or threaten Appellant and did not promise him anything directly or
indirectly to get him to speak. 
Appellant was uncuffed the entire time, was offered an opportunity to go
to the bathroom, and Detective Ruiz bought him a soft drink.  Although Appellant was informed that family
members were present at the CAP office, Detective Posada stated that at no
point was Appellant denied access to them nor was he denied access to the
telephone.

At the cubicle,
Appellant was seated next to Detective Posada. 
The monitor screen was visible as the detective typed the
statement.  After Detective Posada
finished typing, he printed out the statement and gave it to Appellant.  Specifically, Detective Posada told Appellant
to read it completely and to tell him or correct the statement itself if
anything needed to be changed or corrected. 
Appellant did not correct or change the statement.  After he proofread it, Appellant wrote the
time the interview started, the time the statement was finished, and put his
initials next to the date on the statement. 
Appellant initialed next to each constitutional right in the statement,
to indicate that he understood those rights, and then initialed the beginning
and end of each paragraph of the body of the statement.  In the presence of Detectives Baca and Ruiz,
Appellant was asked if he wanted the completed statement submitted as his
statement, and he said yes.  Appellant
then signed the statement, which was witnessed by the two other detectives.








Detective Posada
testified that at no time did he use physical brutality against Appellant to
make him give the statement.  Detective
Posada saw no mental characteristics that would suggest Appellant was incapable
of understanding what was happening or of making a statement.  Detective Posada denied forcing Appellant to
sign the statement or threatening him in any manner.  Likewise, Detective Ruiz testified that
Appellant was not threatened that either his wife or father would be arrested
if he did not give a confession. 
Detective Ruiz also denied ever threatening Ms. Martinez with
arrest.  Detective Baca testified that
Appellant did not appear to be under any type of duress or force when he
witnessed Appellant signing the statement. 
On cross-examination, Detective Posada conceded that the taking of the
statement was not videotaped or audio recorded.

Appellant
testified at the suppression hearing. 
According to him, the detectives never advised him of his Miranda rights
before taking him to the interview room at the CAP office.  Appellant also stated that he was never asked
to waive his rights before talking to the detectives.  Appellant read and initialed the paragraph
containing the Miranda warnings in the statement, but the detectives never
asked whether he was waiving those rights. 
Contrary to Detective Posada=s
testimony, Appellant testified that his right hand was cuffed to the chair
during the interview.  The detectives sat
close to him and tried to intimidate him with anger.  Appellant only agreed to give a statement
because the detectives threatened to put his wife and father in jail and he was
scared for them and himself.  Appellant
was told that they would let him talk to his wife for thirty minutes if he gave
a statement.  Appellant was also told
that he would only get four years in jail if he gave a statement.








Maribel Martinez
also testified on behalf of the defense. 
According to Ms. Martinez, the detectives told her that they believed
Appellant had committed the murder at the car wash and asked her what she knew
about it.  She told them that she did not
know anything and they told her that if she did not give a statement and
testify against Appellant, she would be arrested and so would Appellant=s father.

At the conclusion
of the hearing, the trial court denied Appellant=s
motion to suppress his written statement.

Voluntariness
of Confession

Appellant asserts
on appeal that the trial court erred because the totality of circumstances
indicate that the State did not obtain a voluntary confession.  Specifically, he claims that the State
deliberately concealed its methods of interrogation by not videotaping or
tape-recording the confession and by not having Appellant write a statement in
his own handwriting.  Appellant contends
that any of these methods would have made it difficult for the State to fabricate
a statement and then attribute it to him by coercing him to initial and sign
it.








Article 38.22,
section 2 of the Texas Code of Criminal Procedure governs the admissibility of
Appellant=s written
statement.  Under this section, a written
statement is inadmissible unless the accused, prior to making the statement,
either received warning from a magistrate or received the Miranda warnings, and
prior to and during the making of the statement, knowingly, intelligently, and
voluntarily waived his rights as set out in the warnings.  See Tex.Code
Crim.Proc.Ann. art. 38.22, '
2 (Vernon 2005).  The statute does not
require that the accused=s
written statement be videotaped or tape-recorded, and in his brief, Appellant
concedes to the same.[1]  Further, there is no evidence to support
Appellant=s claim
that the State deliberately sought to conceal the circumstances of his
interrogation by failing to videotape or otherwise record it.

Next, Appellant
asserts that his confession was not voluntary because the detectives threatened
his immediate family members, namely his wife and father, with arrest.  At the suppression hearing, Appellant
testified that Detectives Posada and Ruiz threatened to arrest his wife and
father if he did not give a statement and made promises that he would be
allowed to talk to his wife and would only get fours years in jail if he gave a
statement.  Ms. Martinez testified that
the detectives threatened to arrest her and Appellant=s
father if she did not give a statement and testify against Appellant.  However, Detective Posada denied forcing
Appellant to sign the statement or threatening him in any manner.  He also testified that he did not coerce or
threaten Appellant and did not directly or indirectly promise Appellant
anything.  Similarly, Detective Ruiz
testified that Appellant was not threatened that either his wife or father
would be arrested if he did not confess to the crime.  As the sole judge of the weight and
credibility of the witnesses=
testimony, the trial court could have accepted the detectives= testimony and disbelieved Appellant=s testimony.  See Guzman, 955 S.W.2d at 89.








In considering the
totality of the circumstances, we also observe the following evidence: (1)
Detective Posada testified that he gave Appellant a Miranda warning card at the
scene of the arrest, Appellant indicated that he understood his rights, and
signed and dated the card; (2) at the CAP office, Detective Ruiz told Appellant
the required statutory warnings again before conducting the interview and
Appellant said he understood his rights and agreed to waive them; (3) Appellant
was interviewed for about one hour before his statement was taken and the
entire process lasted about three hours; (4) Appellant was not handcuffed
during the interview and taking of his statement; (5) Appellant was given a
soft drink and was permitted to use the bathroom; (6) Appellant was never
denied access to family members who were present and was not denied access to
the telephone; (7) Appellant did not ask for a lawyer and did not ask to cease
the interview; (8) Detective Posada did not use physical brutality against
Appellant, did not threaten Appellant, and did not force Appellant to sign the
statement; (9) Appellant read the completed statement and initialed the
beginning and end of each paragraph, including the paragraph containing the
Miranda warnings; (10) Appellant did not appear to be under duress or force
when he signed the statement; and (11) Detective Posada saw no mental
characteristics in Appellant that would suggest Appellant was incapable of
understanding what was happening or of making a statement.








There was evidence
that Appellant did not confess until the detectives told Appellant they were
investigating his father as a possible suspect because he had pawned the murder
weapon.  A threat made by a police officer
to arrest or punish a close relative may render an accused=s subsequently made confession
inadmissible.  Roberts v. State,
545 S.W.2d 157, 161 (Tex.Crim.App. 1977). 
However, where no express or implied promise or threat is made by the
police, an accused=s belief
that his cooperation will benefit a relative will not render his subsequent
confession inadmissible.  Id.  In this case, the detectives= investigation had already led to evidence
of involvement by Appellant=s
father and therefore, the comment concerning Appellant=s
father as a possible suspect was not an express or implied threat, but rather
could have been a general statement about the status of the investigation and
an attempt to find out whether Appellant=s
father had committed a crime.  Moreover,
Appellant=s
activities placed his father under suspicion, thus Appellant=s desire to extricate his relative does
not necessarily render his self-motivated confession inadmissible.  See Roberts, 545 sw2d at 161.

After considering
the totality of the circumstances, we conclude that the trial court could have
reasonably determined that Appellant=s
will was not overborne by coercive interrogation methods and thus, the trial
court acted within its discretion in finding that Appellant=s written statement was voluntarily
given.  Issue Two is overruled.

Findings
of Fact and Conclusions of Law

In his third
issue, Appellant contends that the trial court=s
findings of fact and conclusions of law on the voluntariness of his statement
are insufficient for appellate review. 
Specifically, he asserts that the trial court=s
findings amount to a bare recitation of the statutorily required findings
without sufficient connection to the particular facts of this case, that is,
the trial court should have make specific findings as to whether or not
detaining Appellant=s family
while he was being interrogated and the State=s
failure to videotape the alleged confession, vitiated the voluntariness of his
confession.








When the
voluntariness of a statement made by an accused is questioned, the trial court
is required to make an independent finding, outside the jury=s presence, as to whether the statement
was made under voluntary conditions.  See
Tex.Code Crim.Proc.Ann. art.
38.22, ' 6.  If the trial court determines that the
statement was made voluntarily, it must then enter findings of fact and
conclusions of law.  See id.  The findings must be sufficiently detailed to
enable this Court to determine the basis for the trial court=s ruling and to assist Ain determining the sufficiency of the
evidence to support whatever unstated findings of fact were made by the fact
finder.@  Guidry v. State, 9 S.W.3d 133, 141
(Tex.Crim.App. 1999), cert. denied, 531 U.S. 837, 121 S.Ct. 98, 148
L.Ed.2d 57 (2000), quoting Hester v. State, 535 S.W.2d 354, 356
(Tex.Crim.App. 1976).  Section Six,
however, does not require the trial court to make specific findings about why
conflicting testimony does not render the defendant=s
statement involuntary.  Id. 
ARather,
the trial court need only state in its findings the reasons for its conclusion
that the statement was voluntary.@  Id.

Here, the trial
court=s
findings of fact and conclusions of law contained thirteen findings of
fact.  It included findings that:  Appellant was given his Miranda warnings
prior to making any oral statements and prior to giving the written statement;
prior to giving any and all oral and written statements, Appellant
intelligently, knowingly, and voluntarily waived his constitutional rights;
Appellant was not coerced in any fashion when making his written and oral
statements; no promises were made to Appellant in exchange for making his
written and oral statements; Appellant was coherent and understood what was
happening while making the oral and written statements; Appellant=s decision to give the oral and written
statements was not influenced by any factor other than his desire to give the
statements; at no time did Appellant request the presence of counsel; and at no
time did Appellant request to terminate the interviews. 








The trial court=s findings address the issue of whether
or not Appellant was threatened or coerced into giving his written
statement.  The trial court was not
required to specifically address those facts which Appellant believes would
show such coercion.  See Guidry, 9
S.W.3d at 142 (trial court need not outline the testimony which does not
support its conclusions).  We conclude
that the trial court=s
findings of fact were sufficiently detailed to enable this Court to determine
the basis for the trial court=s
rule that Appellant=s written
statement was voluntary.  Issue Three is
overruled.

In Issue One,
Appellant argues that the trial court erred in admitting testimonial hearsay
evidence in violation of his Sixth Amendment right to confrontation.  Specifically, Appellant complains of the
admission of testimony concerning the anonymous Crime Stoppers tip received by
police and statements by Arturo Madrid, Jr. during his interview with the
police.

We review a trial
court=s ruling
to admit or exclude evidence under an abuse of discretion standard.  Montgomery v. State, 810 S.W.2d 372,
391 (Tex.Crim.App. 1991)(op. on reh=g).  An abuse of discretion exists when the trial
court=s
decision was so clearly wrong as to lie outside the zone of reasonable
disagreement, in other words, the trial court=s
decision or action was arbitrary, unreasonable, and made without reference to
any guiding rules or principles.  Id.  

Out-of-court testimonial statements
by a declarant who fails to testify violate the Sixth Amendment=s Confrontation Clause unless the
declarant is unavailable to testify and the accused had a prior opportunity to
cross-examine the declarant.  See
Crawford v. Washington, 541 U.S.
36, 68, 124 S.C.t 1354, 1373-74, 158 L.Ed.2d 177 (2004).








At trial,
Detective Ruiz testified about the anonymous Crime Stoppers tip that the police
received in reference to the murder. 
Detective Ruiz stated that the tipster had detailed information as to
who might be involved in the crime.  Before
further testimony was elicited, Appellant objected on hearsay grounds.  The State prosecutor argued that information
obtained from the tip was not being offered to show the truth of the matter
asserted therein, but rather to show what Detective Ruiz did based upon the
information contained in the tip.  The
trial court overruled Appellant=s
objection and admitted the testimony about the information provided in the
tip.  During cross-examination, Detective
Ruiz was questioned extensively about the information contained in the tip.

We find that
Appellant=s
confrontation complaint with respect to the Crime Stoppers tip was waived.  To preserve a complaint concerning the
admission of evidence, a party must present to the trial court a timely
request, objection, or motion stating the specific grounds for the ruling
desired of the court.  See Tex.R.App.P. 33.1(a)(1)(A).  A general hearsay objection does not preserve
error on Confrontation Clause grounds.  Reyna
v. State, 168 S.W.3d 173, 179 (Tex.Crim.App. 2005).  Moreover, an appellant waives any error
regarding improperly admitted evidence if, as in this case, that same evidence
is brought in later by the defendant or by the State without objection.  Rogers v. State, 853 S.W.2d 29, 35
(Tex.Crim.App. 1993)(en banc); Ethington v. State, 819 S.W.2d 854, 858
(Tex.Crim.App. 1991).

Next, Appellant
complains that the trial court erred in admitting testimony from Detectives
Posada and Baca concerning statements by Arturo Madrid, Jr. to the police
during his interview.  During the defense=s case-in-chief, the following exchange
occurred during the State prosecutor=s
cross-examination of Detective Posada:

The
State:         What did Javier Madrid
say--Arturo Jr. say in his statement in regards to Javier?

 

Defense:           Objection, Your Honor, hearsay.

 

The
Court:        Overruled.

 








Posada:            He said that Javier Madrid showed up
to where he was living on Grenoble, 9232 Grenoble, and that he had a concerned
look on his face.  That he was waiting
for him to give him a hug like he usually does, and he did not give him a hug
because he looked worried and that he had--he told him that he had shot
somebody the night before.  And he gave
him the gun to hold for some time, and the defendant had a tissue with six
case--or he doesn=t say six
casings, he said he had some casings in the tissue that he needed to get rid of
so--

 

Defense:           Excuse me, Detective.  Your Honor . . . I=m
going to be object under the Texas Constitution, the confrontation clause.  I=m
going to object under the United States Constitution, Sixth Amendment
confrontation clause, you know.

 

The trial court overruled Appellant=s confrontation clause objection.  On redirect examination, the following
exchange occurred between defense counsel and Detective Posada:

Defense:           Okay. 
Now, everything that you testified to this jury that my client said to
Arturo; that he didn=t
give him a hug, that he was nervous, that he gave him all these six casings in
a shell [sic], you didn=t
witness this, did you?

 

Posada:            No, sir.

 

Defense:           You=re
repeating what Arturo told you?

 

Posada:            Yes, sir.

 

Defense:           That=s
just rank hearsay, isn=t
it?

 

Posada:            Yes, sir.

 

Defense:           Now, if Arturo was telling you the
truth in his statement, that Javier came and told him about this, that he gave
him the napkin, that it had the six shells, if you thought that this--and then
that Arturo went and buried them, okay, at his mother-in-law=s house on Grenoble Street, if this all
is true--did you think it was true?

 

Posada:            Yes, sir.

 

Defense:           Then Arturo has now become a part of
this crime.  He=s
being a party to this crime; isn=t
that true? You know what a party is, don=t
you?

 








Posada:            Right.  Not a party to the murder, maybe something
else.

 

Appellant later called Detective
Joe Baca to testify.  On
cross-examination, the State prosecutor asked Detective Baca how the gun ended
up in Mr. Madrid,
Jr.=s house and defense counsel objected on
hearsay grounds.  The trial court overruled
the objection.  Detective Baca then
responded, AArturo
Madrid, Jr. stated that Javier Madrid had come over to his house someday in
April of 2002 and he told him about the shooting at the car wash.@ 
Defense counsel then objected on hearsay grounds.  The trial court overruled this
objection.  Several questions later,
defense counsel raised a confrontation clause objection to additional testimony
concerning other statements made by Mr. Madrid,
Jr., which the trial court overruled.

With respect to
Detective Posada=s
testimony, the record shows that Appellant later elicited the same evidence
during his redirect examination without objection.  Therefore, his complaint as to that matter on
confrontation clause grounds is waived.  See
Ethington, 819 S.W.2d at 858.  As for
the complained-of statement during Detective Baca=s
testimony, we observe that Appellant lodged only a hearsay objection to
admission of this testimony.  Defense
counsel may have believed that a general hearsay objection was sufficient to
preserve review of the issue, however, hearsay objections and confrontation
clause objections are Aneither
synonymous nor necessarily coextensive.@  Bunton v. State, 136 S.W.3d 355, 368
(Tex.App.--Austin 2004, pet. ref=d).  As previously noted, a general hearsay
objection does not preserve error on confrontation clause grounds.  See Reyna, 168 S.W.3d at 179.








Even if Appellant
had preserved any error in the admission of this complained-of testimony, we
would nevertheless conclude that the error was harmless.  An appellate court must reverse a judgment of
conviction or punishment unless the court determines beyond a reasonable doubt
that error did not contribute to the conviction or punishment.  See Tex.R.App.P.
44.2(a).  Under this harm analysis, we
calculate as much as possible the probable impact of the error on the jury in
light of the existence of other evidence. 
Wesbrook v. State, 29 S.W.3d 103, 119 (Tex.Crim.App. 2000); Harris
v. State, 790 S.W.2d 568, 587 (Tex.Crim.App. 1989).  While the most significant concern must be
the error and its effects, the presence of overwhelming evidence supporting the
finding in question can be a factor in the evaluation of harmless error.  Wesbrook, 29 S.W.3d at 119; see
also Harris, 790 S.W.2d at 587-88 (outlining factors to consider).








Here, we first
note that the State did not rely upon the complained-of testimony in its
case-in-chief and placed very little emphasis upon it.  In contrast, defense counsel mentioned Arturo
Madrid Jr.=s
statements to police in its closing argument, stating AJunior
was claiming that Javier had confessed to him that he had shot him@ and A[t]here=s nothing to connect those casings to
my client, nothing except his statement, Arturo=s
statement.@  The record shows that the State instead
relied upon the following circumstantial evidence to connect Appellant to the
murder.  Surveillance footage and
eyewitnesses at the murder scene confirmed that the perpetrator was driving a
two-toned Bronco similar to the one that Appellant had access to at the time of
the murder.  Mr. Madrid, Jr.=s former wife, Nancy Zamarripa,
testified that she and Mr. Madrid, Jr. were living at 9232 Grenoble in
April 2002, that Appellant was driving the Bronco, and that Mr. Madrid, Jr. did
not have access to the Bronco at the time. 
Ms. Zamarripa had seen Appellant with a gun, which he kept in his closet
at the Betel address.  After months of
investigation, the police received an anonymous Crime Stoppers tip, which
described the gun and vehicle used in the car wash murder and identified
Appellant as the perpetrator.  The police
confirmed that Appellant=s
father pawned a .357 magnum caliber revolver and owned a Ford Bronco to which
Appellant had access.  Ballistics tests
showed that the bullet fragments recovered from the victim=s body were shot from the pawned
gun.  DNA analysis showed a match between
the blood found on the gun and that of the victim.

Raymond Arno, the
supervisor at Appellant=s
place of employment, testified that Appellant worked from 3 p.m. until 1 a.m.
on April 25, 2002 and from 11:49 a.m. to 6:31 p.m. on April 26.  Mr. Arno occasionally saw Appellant driving
the two-toned Ford Bronco.  Mr. Arno
also testified that Appellant purchased the gun used in the offense from him in
February 2002.  After being interviewed
by police in March 2003, Arturo Madrid, Jr., led the police to the backyard of
a former residence where police located six spent shell casings that had been
fired from the retrieved gun.  In
Appellant=s
voluntary statement, he admitted to shooting the victim twice and then fleeing
the scene in the Ford Bronco.  Appellant
then returned home to his apartment on Betel, cleaned the blood off the gun,
and put the gun back into the closet. 
According to his statement, the next day Appellant told his brother
Arturo that he had shot someone. 
Appellant admitted that in June 2002, he told his father to pawn the gun.

In our harm
analysis, we find that the jury would have probably placed little weight on the
alleged error and we do not think that a rational trier of fact would have
reached a different result if the error had not occurred.  See Harris, 790 S.W.2d at 588.  Further, recognizing that overwhelming
evidence of guilt is a favor to be considered, we conclude beyond a reasonable
doubt that the admission of the alleged testimonial hearsay evidence did not
contribute to Appellant=s
conviction or punishment.  Issue One is
overruled. 

We affirm the
trial court=s
judgment.

 

September
21, 2006

DAVID WELLINGTON
CHEW, Justice

 

Before Barajas, C.J., McClure, and Chew, JJ.

Barajas, C.J., Not Participating

 

(Do Not Publish)











[1]
Appellant did not raise a due process claim as to the State=s failure to document by videotape or
audiotape the taking of his statement at either the suppression hearing or in
the motion to suppress his written statement.