**Opinion filed February 28, 2013**



## In The

# Eleventh Court of Appeals

_____

### No. 11-11-00039-CR

_____

## THOMAS JAMES COLEMAN, JR., Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 35th District Court**

**Brown County, Texas**

**Trial Court Cause No. CR20746**

### M E M O R A N D U M   O P I N I O N

The jury convicted Thomas James Coleman, Jr. of the offense of continuous sexual abuse of a young child and assessed punishment at thirty-five years confinement in the Institutional Division of the Texas Department of Criminal Justice. *See* TEX. PENAL CODE ANN. § 21.02 (West Supp. 2012). The victim was the five-year-old daughter of Coleman's girlfriend, with whom Coleman was living at the time. Coleman asserts in four issues that (1) the evidence is insufficient to support the conviction, (2) the trial court erred when it denied his motion to suppress evidence, (3) the trial court erred when it denied his request for appointment of an

expert, and (4) the trial court erred when it denied his request for instructions for lesser included offenses. We affirm.

In his first issue on appeal, Appellant challenges the sufficiency of the evidence to support the verdict. Specifically, he contends that the evidence is insufficient to establish that the alleged abuse occurred over a period of thirty days or more as required by Section 21.02(b) of the Penal Code.

We review a sufficiency of the evidence issue under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

On August 9, 2009, Clara Sue Gil was at the home of her sister, Jennifer Gil, babysitting her two, and Jennifer's three, children while Jennifer was at work. The oldest child present was Jennifer's five-year-old daughter, Carla Foster.[1] That day, Jennifer's boyfriend, Appellant came home early from work. Shortly after his arrival, Clara noticed that Carla was not in the living room, and Clara walked down the hallway to Appellant and Jennifer's room to find Carla. When she opened the bedroom door, she saw Appellant lying in bed making movements under a blanket that looked to Clara as though he was buttoning his pants. "He had big huge eyes, like he had been caught doing something." Clara went around to the other side of the bed and pulled back the covers. There, under the covers, she found Carla; her pants were pulled down past her knees.

"[W]hat the hell is going on? What the hell is this?" Clara screamed. Appellant replied to her that "it's not what it looks like," that Carla smelled like urine, and that he needed to change her. At trial, Clara testified that Carla was wearing the same clothes in which Clara had dressed her that morning and they did not look like they had been urinated on, that she smelled Carla's pants and they did not smell like urine, and that there were no clothes lying on the bed to indicate that Carla was being changed. Following the confrontation, Clara picked up Carla, went

---

[1]Pseudonym.

2

to the living room, and called Carla's mother, Jennifer, at work to tell her what was happening. After Clara spoke with Jennifer, at Jennifer's insistence, Appellant left the residence.

Following the incident, Jennifer returned home from work. At some point that day, Jennifer spoke with Carla about what happened. Carla told Jennifer that Appellant told her to take her pants off and that he told her to do that a lot. Jennifer asked her how many times, to which Carla replied, "Too many." Jennifer asked, "Well, does he touch you when you take off your pants?" In response, Carla "kind of put her hand down there." "Well, what is he doing whenever you're taking off your pants, like why would he touch you down there?" Jennifer asked. "I don't know. Maybe he is tickling me," Carla answered. Later that same day, Jennifer took Carla to the hospital, and she also called the police.

Before she took Carla to the hospital, Jennifer drove to Appellant's mother's house to speak with Appellant. Appellant told Jennifer that he took Carla into their room to change her and that, when he heard Clara coming down the hall, thinking that it was one of the male children, he told Carla to cover up. She jumped into the bed because she was scared. Jennifer did not think this made sense because her other children, who were both boys, were only one and two years old and because all of the children took baths together. After listening to Appellant's explanations, Jennifer left Appellant's mother's house, called the police, and took Carla to the hospital because she felt like "[n]one of it made sense." At that point, Jennifer stated that she had no idea in terms of what possible abuse Carla may have undergone.

At the hospital, Carla was examined, and Jennifer gave Deputy James Stroop of the Brown County Sheriff's Office what information she knew. Following their discussion, Deputy Stroop went to Jennifer's residence and met with Clara. While Jennifer and Carla were still at the hospital, Deputy Stroop gathered evidence, which included taking pictures and collecting some bedding and some items of clothing that Carla had worn that day. After Deputy Stroop's initial investigation, he spoke with Sergeant Lana Guthrie of the Brown County Sheriff's Office and filed his report.

The next day, Appellant came to Sergeant Guthrie's office and wanted to speak with her. Appellant told her that he was being accused of sexually abusing a child and that he wanted to give her his side of the story. Sergeant Guthrie invited him into her office and began the conversation, which she recorded on audiotape. A redacted copy of the conversation was admitted into evidence and published at trial. Appellant told Sergeant Guthrie that he had taken

3

Carla into the bedroom to change her clothes because she smelled like urine. Carla was changing clothes next to the bed when Appellant heard footsteps and told her to cover up. Carla jumped into the bed shortly before Clara walked into the room. Appellant claimed that he did not then, nor had he ever, touched Carla's genitals. During the conversation, Sergeant Guthrie asked Appellant whether he would be willing to meet with Specialist Sergeant Matthew Mull with the Texas Department of Public Safety division formerly known as Special Crimes (currently Criminal Investigations) for a follow-up interview. Appellant said he would, and Sergeant Guthrie told him that she would contact him in the future about that interview. After Appellant was finished speaking with Sergeant Guthrie, he left.

That same day, Jennifer went to the sheriff's office, spoke with Sergeant Guthrie, and gave a handwritten statement of her version of the events. Jennifer also agreed to take Carla to the Child Advocacy Center so that she could be interviewed by a forensic interviewer and examined. An appointment for the forensic interview was made that day.

Two days later, Jennifer took Carla to the Hill Country Children's Advocacy Center for the forensic interview. Mike Betancourt conducted the interview. During the interview, Carla did not make an outcry. Based on Carla's responses, it appeared to Betancourt that Carla "was avoiding the issue of dealing with [Appellant]." Appellant offered a copy of the video of the interview into evidence, and it was admitted and published to the jury. After the interview, an appointment was made to meet with a sexual assault nurse examiner.

On August 25, 2009, Sergeant Mull interviewed Appellant in a Brownwood Police Department conference room, which was located in the Law Enforcement Center in Brownwood, Texas. Sergeant Mull began the interview by reading the *Miranda*[2] warnings to Appellant and making sure that he understood those warnings. Appellant indicated that he wanted to waive those rights, and he signed a document reflecting such waiver. Appellant told Sergeant Mull his version of the events, and Sergeant Mull reduced Appellant's account to a written statement. The written statement included the *Miranda* warnings at the top of the page. In the statement, Appellant recounted much of the same details about the events of August 9, 2009, that he had previously given to Sergeant Guthrie. However, there were significant differences. In this version of events, he stated that, on August 9, 2009, when Carla was in the bedroom changing clothes, he "touch[ed] her vagina when [h]e grabbed the shorts to pull them down" and "rubbed

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

her vagina with the back of [his] right hand to see if her vagina was wet." Additionally, he stated that "[i]n the past [he had] touched [Carla]'s vagina when wrestling and when bathing her." When bathing her, "[his] finger or the scrubber may have went [sic] inside her," and when they were wrestling, his "hand may have went [sic] inside her vaginal area" as he was "pick[ing] her up by the leg and crotch areas."

After Appellant had given the written statement, Sergeant Mull asked Sergeant Guthrie to come in and witness Appellant sign the statement. She watched Appellant sign the statement, and then she signed the statement reflecting what she had witnessed. Because of their belief that Appellant had not been completely truthful in the statement, Sergeant Guthrie and Sergeant Mull continued to question Appellant. Sergeant Mull and Sergeant Guthrie believed that Appellant was not being truthful based on inconsistencies between this statement and what he had told them in each of their interactions with him, as well as Appellant's demeanor that day. Within an hour, Appellant admitted that he had not been completely truthful and, after being verbally given *Miranda* warnings again, gave a second statement.

In the second written statement, which was admitted into evidence and published to the jury, in addition to acknowledging his *Miranda* rights, Appellant stated in pertinent part:

> I am giving this statement voluntary [sic] and by my own free will, I have not been promised anything in return for giving this statement. I was not completely truthfully [sic] in my first statement to Sergeant Mull. This statement is the truth about me touching [Carla]'s vagina. I have touched [Carla]'s bare vagina with my hand numerous times, more than I can count. Three times when touching [Carla]'s vagina[,] I placed my left index finger inside of her vagina. I put my finger inside [Carla]'s vagina because I was curious to see what it felt like. This was a sexual curiosity that caused me to put my finger inside of her. All three times that I put my finger inside of [Carla]'s vagina occurred at our house on Avenue E in Brownwood. All three times I put my finger inside of [Carla]'s vagina; [sic] Jennifer was either at work or in another room in the house. The first time I put my finger inside of [Carla]'s vagina was in her bedroom. I was helping her change clothes and I touched her to see if she was wet and then continued by putting my finger inside of her vagina. The second time I put my finger inside of [Carla]'s vagina was in the bathroom after I got her out of the bathtub while I was drying her off. The last time I put my finger inside of [Carla]'s vagina was in my bedroom, [sic] I was helping her change clothes again. . . . The three times I put my finger inside [Carla]'s vagina[,] it was for sexually [sic] reasons[,] but I never got an erection.

In addition to the written statement, Appellant also provided a drawing of his hand on which he indicated the depth of the finger insertion. After he signed and initialed the drawing and the second statement, Appellant left the interview.

During Sergeant Guthrie's testimony, she was asked about the time period in which all of the incidents described in Appellant's statement took place. She explained that sometime around the first of July 2009, Appellant, Jennifer, and Jennifer's children moved to Bluebonnet Trailer Park, where they were living when the August 9, 2009 incident occurred. Prior to the move, they lived at the Avenue E residence to which Appellant referred in his statement. Appellant began living with Jennifer and her children at the Avenue E residence in August 2008. Based on her communications with Appellant and Jennifer, Sergeant Guthrie confirmed that a time period of more than thirty days existed between when they moved from the Avenue E residence and when the August 9, 2009 incident occurred. She also confirmed that the time period during which Appellant lived with Jennifer and her children at the Avenue E residence was greater than thirty days as well and that, based on the totality of the information provided to her, she believed the incidents—the "touch[ing of Carla]'s bare vagina" and the digital penetration referred to in Appellant's statement—happened over a period of a year.

Sergeant Mull also testified to the timeline of Appellant's actions. He stated that, although Appellant never gave him a specific time frame, "it was a great deal of time. Months."

A little over a month after Carla's forensic interview, Jennifer took Carla to the advocacy center to be examined by a sexual assault nurse examiner. Shelly Buley, a registered nurse, administered the examination. During the examination, Nurse Buley asked Carla why she was there. Carla stated, "He touched me with his hand down there," and pointed to her private area. Carla continued, "Sometimes it hurt. . . . But when I told him -- I asked him to stop, he would." When Nurse Buley asked who Carla was talking about, Carla stated, "[Appellant]. He did it a whole bunch of times." Nurse Buley then conducted the physical portion of the exam. She found no injuries or signs of trauma to Carla's genital region. Nurse Buley testified that the lack of injury was normal and consistent with minor digital penetration or touching of the vagina and that there was nothing inconsistent with the exam and the history as given by the child.

Because the State charged Appellant with continuous sexual abuse of a young child, the State had to prove three elements: (1) the defendant "commit[ted] two or more acts of sexual abuse," (2) "during a period that is 30 or more days in duration," and (3) "at the time of the

6

commission of each of the acts of sexual abuse, the [defendant was] 17 years of age or older and the victim [was] a child younger than 14 years of age." Section 21.02(b); *Brown v. State*, 381 S.W.3d 565, 569 (Tex. App.—Eastland 2012, no pet.). Here, Appellant challenges the sufficiency of the evidence to establish the second element. He contends the State presented no evidence as to the time frame of the alleged abuse on which the jury could have reasonably concluded that the abuse occurred over a period of thirty days or more in duration.

The offense of continuous sexual abuse of a young child does not require that the exact dates of the abuse be proven. *Brown*, 381 S.W.3d at 574; *see* Section 21.02(b). The legislature created the offense in response to a need to address sexual assaults against young children who are normally unable to identify the exact dates of the offenses when there are ongoing acts of sexual abuse. *Brown*, 381 S.W.3d at 574; *see Williams v. State*, 305 S.W.3d 886, 890 n.7 (Tex. App.—Texarkana 2010, no pet.) (citing *Dixon v. State*, 201 S.W.3d 731, 737 (Tex. Crim. App. 2006) (Cochran, J., concurring) ("Perhaps the Texas Legislature can address this conundrum and consider enacting a new penal statute that focuses upon a continuing course of conduct crime—a sexually abusive relationship that is marked by a pattern or course of conduct of various sexual acts.")). However, although the exact dates of the abuse need not be proven, the offense does require proof that there were two or more acts of sexual abuse that occurred during a period that was thirty or more days in duration. *Brown*, 381 S.W.3d at 574; *see* Section 21.02(d); *Williams*, 305 S.W.3d at 890–91. Furthermore, "members of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed." Section 21.02(d).

We believe the evidence is legally sufficient to prove that Appellant committed two or more acts of sexual abuse that occurred during a period that was thirty or more days in duration. Clara's testimony and Appellant's first written statement, along with the testimony of Nurse Buley, Sergeant Guthrie, and Sergeant Mull, sufficiently support a conclusion that Appellant engaged in sexual contact with Carla on August 9, 2009. Although August 9, 2009, was the only specific date given on which an instance of sexual abuse occurred, the State presented extensive evidence to support the jury's finding that the abuse took place on multiple occasions over a period of more than thirty days. In his second written statement, Appellant admitted that, on three separate occasions, he placed his finger inside Carla's vagina. He also stated that those three acts of abuse took place while they lived at the Avenue E residence. Sergeant Guthrie

testified that more than thirty days passed between the time Appellant and the family moved from the Avenue E residence and the date the August 9, 2009 incident occurred.

In addition to the three instances of digital penetration, Appellant also admitted in his second statement that "[he] touched [Carla]'s bare vagina with [his] hand numerous times, more than [he could] count." Nurse Buley testified that, in Carla's outcry, Carla stated that "[Appellant] did it a whole bunch of times." Sergeant Guthrie and Sergeant Mull both testified that, based on their communications with Appellant, they believed the sexual contact occurred over a period of months.

Based on the evidence recounted above and any reasonable inferences from it, when viewed in the light most favorable to the verdict, a rational trier of fact could have found beyond a reasonable doubt that Appellant committed two or more acts of sexual abuse during a period that was thirty or more days in duration. *See* Section 21.02(b); *Jackson*, 443 U.S. at 319; *Isassi*, 330 S.W.3d at 638. Appellant's first issue is overruled.

In his second issue, Appellant contends that the trial court committed reversible error when it denied Appellant's motion to suppress the written statements that he gave to law enforcement and when it admitted them into evidence. We review a trial court's ruling on a motion to suppress for an abuse of discretion. *Lujan v. State*, 331 S.W.3d 768, 771 (Tex. Crim. App. 2011); *Oles v. State*, 993 S.W.2d 103, 106 (Tex. Crim. App. 1999). In reviewing a ruling on a motion to suppress, we apply a bifurcated standard of review. *Hubert v. State*, 312 S.W.3d 554, 559 (Tex. Crim. App. 2010); *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). First, we afford almost total deference to the trial court's determination of historical facts. *Valtierra*, 310 S.W.3d at 447. The trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Id.*; *Garza v. State*, 213 S.W.3d 338, 346 (Tex. Crim. App. 2007). Second, we review de novo the trial court's application of law to facts. *Hubert*, 312 S.W.3d at 559; *Valtierra*, 310 S.W.3d at 447. We will sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Valtierra*, 310 S.W.3d at 447–48; *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

Appellant contends that his statements were not voluntary for the following reasons: (1) Appellant was interrogated continuously without a break for over three hours before the first statement was taken and then for another hour before the second statement was taken; (2) the

tactics used by the officers during the interview were improper; and (3) because of Appellant's history of learning disabilities and special education enrollment, Appellant was more susceptible to high pressure situations than the average individual.

A defendant's statement may be used in evidence against him if he made it freely and voluntarily and without compulsion or persuasion. TEX. CODE CRIM. PROC. ANN. art. 38.21 (West 2005). "The determination of whether a confession is voluntary is based on an examination of the totality of circumstances surrounding its acquisition." *Wyatt v. State*, 23 S.W.3d 18, 23 (Tex. Crim. App. 2000) (quoting *Penry v. State*, 903 S.W.2d 715, 744 (Tex. Crim. App. 1995)). A statement may be involuntary "if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker." *State v. Terrazas*, 4 S.W.3d 720, 723 (Tex. Crim. App. 1999) (quoting *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995)). The ultimate question for a court to answer when it determines voluntariness is "whether the suspect's will was overborne" by the conduct of the state actor. *Creager v. State*, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997). Some relevant circumstances include the length of the detention and interrogation, whether the defendant was permitted access to his family or attorney, and the presence or absence of physical brutality. *Gomes v. State*, 9 S.W.3d 373, 377 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) (citing *Armstrong v. State*, 718 S.W.2d 686 (Tex. Crim. App. 1985), *overruled on other grounds by Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998)). A defendant's characteristics and status, as well as the conduct of the police, are also important concerns. *Haynes v. Washington*, 373 U.S. 503, 517 (1963).

Before the trial, the trial court held a hearing on Appellant's motion to suppress to determine the voluntariness and admissibility of Appellant's statements. *See Jackson v. Denno*, 378 U.S. 368, 376–77, 392–93 (1964). The trial court found that Appellant had freely and voluntarily made his statements and that the statements would be admissible against Appellant. At the hearing, Sergeant Guthrie testified about the first meeting she had with Appellant, which occurred after he showed up at her office unannounced. She described their discussion, which we have recounted above, noting that Appellant came to see her of his own free will and was free to leave at any time. He was not placed under arrest and was not deprived of any basic necessities such as food or water. During the conversation, which contained no admissions of sexual contact, Sergeant Guthrie and Appellant discussed Appellant's willingness to take a

polygraph exam and be contacted as her investigation progressed. Appellant agreed to take a polygraph. The audio recording, which was made of the interview, does not suggest any coercion or confusion but, rather, simply contains a discussion about Appellant's version of events.

Next, Sergeant Guthrie testified about the subsequent interview, which was primarily conducted by Sergeant Mull. She stated that, before the interview, she called Appellant and asked him to come meet with Sergeant Mull for a polygraph examination. She did not see Appellant the day of the interview with Sergeant Mull until she was called by Sergeant Mull to witness Appellant signing the first written statement. Sergeant Mull and Appellant were in a conference room in the Law Enforcement Center. She stated that, when she arrived to witness Appellant sign the statement, Appellant appeared to sign it voluntarily, and she observed that the *Miranda* warnings were present on the statement.

After the statement was signed by Appellant, Sergeant Guthrie and Sergeant Mull began to question Appellant about his statement. While they questioned Appellant, Sergeant Guthrie and Sergeant Mull sat on one side of a table positioned in the conference room, and Appellant sat on the other side with his back to the wall on which the door was located. Sergeant Guthrie stated that they told Appellant that they believed he was being untruthful. They told Appellant about the effects on Carla of the incident—specifically, that she had been interviewed and had a sexual assault exam. They discussed urinary tract infections Carla had had in the past and how those could be caused by Appellant inserting his finger into her. After Sergeants Guthrie and Mull finished their questioning, Appellant gave a new statement and drew a picture of his hand on which he indicated the depth of the vaginal penetration by his finger. Prior to taking the second statement, *Miranda* warnings were given to Appellant again. Sergeant Guthrie stated that she observed no indicators of mental conditions or problems, that it did not appear to her that Appellant had any problems understanding them or was under the influence of drugs or alcohol, and that at no time while she was present was Appellant handcuffed.

Sergeant Mull also testified at the hearing. He stated that, when he arrived at the Law Enforcement Center on the day the interview was conducted, Appellant was already waiting for him in the lobby. He stated that, after going into the conference room to ensure that it was ready, he went back to the lobby and escorted Appellant to the conference room. Appellant was not in custody and could have turned around, walked out the door, and never met with Sergeant Mull. Before talking to Appellant in the conference room, Sergeant Mull gave Appellant the *Miranda*

10

warnings, and Appellant signed a waiver of those rights in which he also indicated that he understood his rights. Sergeant Mull then asked Appellant several questions concerning mental health so that he could determine whether Appellant was mentally capable of participating in a polygraph exam. These questions included whether Appellant had seen a psychologist or psychiatrist, had ever been to a mental hospital, or was under the influence of drugs or alcohol. Appellant answered "no" to these questions.

After he explained to Appellant how the polygraph works, Sergeant Mull gave Appellant an opportunity to tell his side of the story. At that point, Appellant admitted to Sergeant Mull that he had touched Carla's vagina. Because of Appellant's admission, Sergeant Mull decided to take a written statement from Appellant instead of administering the polygraph. As stated above, the written statement contained the *Miranda* warnings at the top of the page. The remainder of Sergeant Mull's testimony tracks the testimony of Sergeant Guthrie. Though he chose not to do so, Appellant was allowed to leave and was not prevented from leaving at any time. Sergeant Mull testified that he specifically told Appellant he could leave at least three times at the beginning of the interview. Appellant was not deprived of food, water, or anything else.

After Sergeant Mull testified at the hearing, Appellant testified. He stated that he graduated from high school but was in special education classes. Appellant stated that forty-five minutes before arriving for the interview he ate lunch and that, going into the interview, he understood that he was being accused of a sexual crime against a child. Appellant confirmed that he went to the interview of his own free will and that he was not in custody when he got there. Appellant testified that, once the interview began, he did not know what to expect and felt "kind of scared, because I'd never been through it before," but he affirmed that Sergeant Mull read him the *Miranda* warnings and told him that he was free to go. Appellant stated that he understood his rights and knowingly, intelligently, and voluntarily waived them. Appellant said that Sergeant Mull challenged and questioned Appellant's truthfulness and told Appellant that Carla's urinary tract infections were caused by Appellant, indicating that Appellant had sexually assaulted her. When asked whether he felt like he could leave when Sergeant Mull took a break, Appellant stated that he "was kind of scared" and "didn't know what to do, so [he] just sat there." Appellant testified that he was not confined or handcuffed during the interview and that, even though Sergeant Mull told him he could leave, he did not. At one point, Appellant said that he did try to leave but that Sergeant Guthrie continued to ask him questions. Although Sergeant

11

Guthrie did not say something like "if you confess, everything will be okay," Appellant testified that was the impression he got. Appellant stated that the statements he signed were not exactly accurate but that he signed and initialed the statements because he wanted Sergeant Guthrie to leave Carla alone.

Carol Coleman, Appellant's mother, testified. In response to a question about whether Appellant had any mental limitations that would prevent him from understanding things the way an average individual would, she stated that Appellant was in special education classes and has dyslexia. Carol claimed that, "some of the time when there is pressure, . . . [Appellant] doesn't comprehend what he is being told" and does not stand up well to pressure.

Based on our review of the record, we cannot say the trial court abused its discretion when it refused to suppress Appellant's statements. Despite the noncustodial nature of the interview, Appellant was Mirandized repeatedly and affirmed at the hearing that he understood those rights. He acknowledged that he was told on numerous occasions that he was free to leave and that he was not threatened. Appellant's mother testified that Appellant had mental limitations that would prevent him from understanding things the way an average individual would and that he would thus be more susceptible to coercion. However, in addition to Sergeant Guthrie's and Sergeant Mull's description of the interview, the trial court was able to observe for itself Appellant's ability to communicate and respond to questioning when Appellant testified at the hearing.

The record, as recounted above, does not reflect that Appellant's mental state was such that it rendered his statements involuntary. *See Licon v. State*, 99 S.W.3d 918, 925 (Tex. App.— El Paso 2003, no pet.) ("mere emotionalism or confusion alone will not render a confession inadmissible"). A finding of coercion is a matter that relies heavily on a determination of the witnesses' credibility. *Schnidt v. State*, 357 S.W.3d 845, 855 (Tex. App.—Eastland 2012, pet. ref'd). We give deference to the trial court's rulings on questions of fact when those rulings turn on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). It is clear that the trial court believed Sergeant Guthrie's and Sergeant Mull's testimony that showed that Appellant was not mentally overborne and that Appellant's statements were given freely and voluntarily without compulsion or persuasion. Appellant's second issue is overruled.

In his third issue, Appellant contends that the trial court committed reversible error when it denied Appellant's request for appointment of an expert in psychology to assist with the preparation and presentation of his defense.

We review the trial court's ruling for abuse of discretion. *Griffith v. State*, 983 S.W.2d 282, 287 (Tex. Crim. App. 1998). When an indigent defendant makes a threshold showing that expert assistance would likely be a significant factor at trial, he is entitled to the appointment of an expert. *Ake v. Oklahoma*, 470 U.S. 68, 82–83, 86 (1985); *Griffith*, 983 S.W.2d at 286–87. To make this preliminary showing, a defendant must offer more "than undeveloped assertions that the requested assistance would be beneficial." *Williams v. State*, 958 S.W.2d 186, 192 (Tex. Crim. App. 1997). To determine if a defendant is entitled to the requested expert, three factors are relevant: (1) the private interest that will be affected by the State's action; (2) the governmental interest that will be affected if the safeguard is to be provided; and (3) the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided. *Ake*, 470 U.S. at 77; *Rey v. State*, 897 S.W.2d 333, 337 (Tex. Crim. App. 1995). The purpose is to ensure that the indigent defendant has access to a competent expert to assist in the evaluation of his defense. *Ake*, 470 U.S. at 77; *Griffith*, 983 S.W.2d at 286. The type of expert and the nature and complexity of the field of specialty must be considered in deciding if an expert will be helpful or a significant factor at trial. *Griffith*, 983 S.W.2d at 287. "The key question appears to be whether there is a high risk of an inaccurate verdict absent the appointment of the requested expert." *Busby v. State*, 990 S.W.2d 263, 271 (Tex. Crim. App. 1999).

In his motion for appointment of an expert, Appellant requested the appointment of an expert in the field of psychology and coerced/involuntary confessions. He contended that, based on the circumstances under which the statements were taken and Appellant's psychological history, there might be questions concerning the voluntariness of the statements. Appellant claimed that expert assistance was needed to determine what factors might have impacted the voluntariness of the statements Appellant gave to law enforcement. This motion, along with a motion for continuance, were both filed on the day of the trial, December 6, 2010. After a hearing, the trial court denied both motions and proceeded to trial.

We hold that the trial court did not abuse its discretion when it denied Appellant's motion for appointment of an expert. In addition to Appellant filing the motion on the day of the trial

13

setting, we take note that the filing date, December 6, was also over a month after the trial court granted Appellant's previous motion for continuance on October 25, the day the trial was previously set to begin. In that motion, Appellant made no mention of the need for an expert. The filing date was also over three months after the trial court held a hearing and denied Appellant's motion to suppress on August 23. The key issue addressed by the trial court in the hearing on the motion to suppress, as discussed above, was the voluntariness of Appellant's written statements. Here, the trial court had already determined that the evidence showed that Appellant was not mentally overborne and that Appellant's statements were given voluntarily.

Additionally, although seemingly verified by Appellant's trial counsel, his motion was not supported by affidavits supporting Appellant's request. Instead, Appellant contended:

> Without expert assistance, counsel cannot know whether a person with the Defendant's mental health history would be more susceptible to external influences under the circumstances of this case. Furthermore, only an expert can convey the possible impact of the Defendant's mental history or various external influences on his capacity for knowingly and voluntarily making the statements taken by law enforcement.

The motion provides no basis for Appellant's contentions concerning Appellant's mental health but, rather, contains only vague and conclusory assertions such as "[t]he circumstances under which the statements were taken, as well as Defendant's psychological history, suggest that there may be questions as to their voluntariness." As stated above, a defendant must offer more "than undeveloped assertions that the requested assistance would be beneficial." *Williams*, 958 S.W.2d at 192. Thus, Appellant did not make the preliminary showing of his need to obtain an expert witness. *Id.* The trial court did not abuse its discretion when it denied Appellant's motion to obtain an expert witness. Appellant's third issue is overruled.

In his fourth issue, Appellant argues that the trial court committed reversible error when it denied Appellant's request for jury instructions on the lesser included offenses of aggravated sexual assault of a child and indecency with a child.

An offense is a lesser included offense if (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged; (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission; (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its

14

commission; or (4) it consists of an attempt to commit the offense charged or an otherwise included offense. TEX. CODE CRIM. PROC. ANN. art. 37.09 (West 2006).

To determine whether Appellant was entitled to the requested instructions, we must compare the statutory elements of continuous sexual abuse of a young child, as addressed in the particular allegations in the indictment, with the statutory elements of aggravated sexual assault of a child and indecency with a child and determine whether "the proof for the offense charged includes the proof necessary to establish the lesser-included offense and [whether] there is some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser-included offense." *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007) (citing *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994)).

Here, the first prong of our analysis is satisfied. The offenses of aggravated sexual assault of a child and indecency with a child, as alleged in the indictment in the case before us, are lesser included offenses of the offense of continuous sexual abuse under Section 21.02 of the Penal Code.

> To the extent that a continuous-sexual-abuse indictment alleges certain specific offenses, an "offense listed under Subsection (c)" will *always* meet the first step of the *Hall* analysis. It will always be "a lesser included offense of the offense alleged under Subsection (b)." Unlike cases in which the lesser offense is not actually listed in the indictment (e.g. criminally negligent homicide in a murder indictment), continuous sexual abuse is, by its very definition, the commission under certain circumstances of two or more of the offenses listed in Subsection (c).

*Soliz v. State*, 353 S.W.3d 850, 854 (Tex. Crim. App. 2011) (footnote omitted).

Thus, we must determine whether there is some evidence in the record that would permit a rational jury to find that, if the defendant is guilty, he is guilty only of the lesser offense. *Hall*, 225 S.W.3d at 536. Appellant argues that "the [S]tate presented evidence of a specific date, August 9, 2009, for the events it alleged constituted at least one of the incidents . . . on which it sought a . . . conviction. From this evidence, the jury could have concluded, had it been given the option, that Appellant was guilty only of a single instance of either" of the requested lesser included offenses.

We have outlined the evidence above and have examined the entire record. We hold that there is no evidence in the record that would permit a jury rationally to find that, if Appellant is guilty, he is guilty only of a lesser included offense. While Appellant is correct in that the State

did present evidence of a specific date on which one of the assaults occurred, there is no evidence in the record to suggest that only one assault occurred. At trial, Appellant did not challenge whether specific instances of assault occurred but, rather, asserted that no inappropriate sexual contact occurred. Under this record, the lesser included offenses are not valid and rational alternatives to the charge against Appellant. *Hall*, 225 S.W.3d at 535–36. Appellant's fourth issue is overruled.

The judgment of the trial court is affirmed.


JIM R. WRIGHT
CHIEF JUSTICE


February 28, 2013

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.