# NO. 12-16-00330-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *STACY MARIE PARSONS,* *APPELLANT* | § | *APPEAL FROM THE 173RD* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,* *APPELLEE* | § | *HENDERSON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Stacy Marie Parsons appeals her conviction for capital murder. Appellant raises five issues challenging the trial court's denial of her motion for continuance, the constitutionality of her sentence, and the admissibility of certain evidence. We affirm.

## BACKGROUND

Appellant was charged by indictment with capital murder and three counts of attempted capital murder. Before trial, three experts evaluated Appellant and opined that she is intellectually disabled.[1] The State eventually waived the death penalty and abandoned the attempted capital murder charges. Appellant pleaded "not guilty" to capital murder and the matter proceeded to a jury trial.

At trial, the evidence showed that Appellant and her boyfriend, Gary Wyatt, had a disagreement about how Appellant was treating the couple's four-year-old daughter, Victoria. Appellant arose early the next morning and held a pillow over Victoria's face. When this failed to kill Victoria, Appellant took her to a creek where she stabbed her with a metal object, beat her head with a rock, and ultimately drowned her.

---

[1] The term "intellectual disability" describes the same phenomenon formerly known as "mental retardation." *See* **Hall v. Florida**, 134 S. Ct. 1986, 1990, 188 L. Ed. 2d 1007 (2014).

After hearing the evidence, the jury found Appellant "guilty" of capital murder, and the trial court imposed the mandatory sentence of imprisonment for life without the possibility of parole.[2] This appeal followed.

MOTION FOR CONTINUANCE

In Appellant's first issue, she argues that the trial court erred by denying her motion for continuance to obtain a fetal alcohol syndrome expert.

**<u>Standard of Review and Applicable Law</u>**

The Texas Legislature set forth the requirements for a motion for continuance in Articles 29.03 and 29.08 of the Texas Code of Criminal Procedure. *Anderson v. State*, 301 S.W.3d 276, 278–79 (Tex. Crim. App. 2009). Article 29.03 states that "[a] criminal action may be continued on the written motion of the State or of the defendant, upon sufficient cause shown; which cause shall be fully set forth in the motion." TEX. CODE CRIM. PROC. ANN. art. 29.03 (West 2006); *Anderson*, 301 S.W.3d at 279. Article 29.08 provides that "[a]ll motions for continuance must be sworn to by a person having personal knowledge of the facts relied on for the continuance." TEX. CODE CRIM. PROC. ANN. art. 29.08 (West 2006); *Anderson*, 301 S.W.3d at 279.

The court of criminal appeals has construed these statutes to require a sworn written motion to preserve appellate review from a trial court's denial of a motion for continuance. *See Anderson*, 301 S.W.3d at 279. Thus, if a party makes an unsworn oral motion for continuance and the trial court denies it, the party forfeits the right to complain about the trial court's ruling on appeal. *See id.*

The granting or denying of a motion for continuance is within the sound discretion of the trial court. *Renteria v. State*, 206 S.W.3d 689, 699 (Tex. Crim. App. 2006). The resolution of a motion for continuance for the purpose of securing expert assistance is particularly within the discretion of the trial court. *Gonzalez v. State*, 304 S.W.3d 838, 844 (Tex. Crim. App. 2010). To establish reversible error based on the denial of a pretrial motion for continuance, an appellant must show that the trial court erred in denying the motion and that the lack of a continuance harmed her. *Id.* at 843.

---

[2] The punishment for capital murder is life without parole if the defendant was eighteen years of age or older at the time of the offense and the state does not seek the death penalty. *See* TEX. PENAL CODE ANN. § 12.31(a) (West Supp. 2017).

2

**Analysis**

After both Appellant's and the State's experts opined that Appellant is intellectually disabled, the State waived the death penalty, and a trial date of April 18, 2016 was set. The record indicates that Appellant moved for a continuance of the trial and funding to retain a fetal alcohol syndrome expert. At a pretrial hearing on the motion, defense counsel stated he received information that Appellant's birth mother, Carolyn Betts, was an alcoholic and used drugs during her pregnancy with Appellant. Based on this information, defense counsel believed Appellant might have fetal alcohol syndrome. He asserted that if Appellant has fetal alcohol syndrome, her resulting diminished capacity would be relevant to the mens rea element, i.e., whether she intentionally killed Victoria. The trial court noted that Appellant's intellectual disability was already established and questioned what additional relevance a fetal alcohol syndrome diagnosis would have. Defense counsel did not have an answer to that question, but repeated that he would like to present the fetal alcohol syndrome evidence to the jury if such evidence existed. The trial court denied the motions for continuance and funding, and Appellant's trial began in November 2016.

On appeal, Appellant argues that "[t]he trial court's denial of the motion for continuance to obtain an expert on fetal alcohol syndrome, and disallowing evidence of Appellant's intellectual disability to be further investigated to support the evidence of her mental state denied [her] a fair trial in violation of due process, the 8th Amendment, and denied her a right to present a defense." Although Appellant does not expressly challenge the denial of her motion for funding, the State construes her arguments to raise challenges to both motions. In response, the State argues that we should overrule Appellant's issue because (1) the delay between the original trial date and the date the trial actually began constitutes a de facto grant of the motion for continuance, (2) defense counsel presented no evidence that Appellant's diminished capacity negated the mens rea element, (3) defense counsel failed to make a threshold showing of a need for a fetal alcohol syndrome expert, (4) defense counsel presented no evidence showing how fetal alcohol syndrome might affect a person's ability to form the mens rea, and (5) the trial court heard sufficient evidence of Appellant's intent to kill Victoria in a pretrial suppression hearing.

Regarding Appellant's challenge to the trial court's denial of her motion for continuance, we find in the record no motion for continuance to retain a fetal alcohol syndrome expert in compliance with Articles 29.03 and 29.08. As a result, we conclude that Appellant forfeited her

3

appellate challenge to the trial court's denial of her motion for continuance. *See **Anderson**,* 301 S.W.3d at 279.

Furthermore, we agree with the State that the trial court acted within its discretion in denying Appellant's motion for funding to retain a fetal alcohol syndrome expert. An indigent defendant has a right to a state-provided expert witness only when she makes a preliminary threshold showing with facts or evidence that the expert's testimony will likely be a significant factor in her defense or the state's prosecution. ***Ehrke v. State***, 459 S.W.3d 606, 610 (Tex. Crim. App. 2015). Here, defense counsel stated his belief, based on Betts's drug and alcohol use during pregnancy, that Appellant might have fetal alcohol syndrome disorder and that it might have affected her ability to form the required mens rea. However, the trial court heard extensive evidence supporting the mens rea element in a pretrial suppression hearing.

The evidence showed that after the killing, Appellant placed Victoria's body in the trunk of the car, drove home, walked to the police station, and reported that she just murdered her child. In her subsequent recorded interview, she told the police that she was a hundred percent guilty. She said she told Wyatt that "if he did the dope again, [she] would kill his daughter." Wyatt said he was going to leave Appellant, and Appellant did not want to raise Victoria alone. Appellant decided that if Wyatt "wants to be alone," she would "make him be alone." She said that she held Victoria underwater until there were "no more bubbles." Appellant said that Victoria was "in a better place, and [Appellant] will be in prison." These statements constitute strong evidence that, regardless of any possible mental issues, Appellant intentionally killed Victoria. We conclude the trial court was within its discretion to find that Appellant failed to make a preliminary threshold showing that a fetal alcohol syndrome expert's testimony would likely be a significant factor in her defense or the state's prosecution. *See **id.*** Accordingly, we overrule Appellant's first issue.

## DIMINISHED CAPACITY

In Appellant's second issue, she complains that her rights under the Eighth and Fourteenth Amendments to the U.S. Constitution and Article I of the Texas Constitution were violated because evidence of her intellectual disability was not allowed during her trial on guilt-innocence. She argues that she should "at least have had the chance to persuade the jury regarding her [intellectual disability] and how that disability affected her mental processes which

resulted in the death of her child." Appellant contends that her intellectual disability, emotional problems, and childhood background of abuse and neglect render her incapable of forming "actual intent."

It is unclear from Appellant's brief whether she is arguing that the trial court erred by refusing to admit evidence related to her intellectual disability, emotional problems, and childhood background because those factors affected her mens rea, or whether she is essentially asking us to conclude that she has a constitutional right to a diminished capacity affirmative defense. Either way, we cannot grant her relief.

Texas does not recognize diminished capacity as an affirmative defense. *Jackson v. State*, 160 S.W.3d 568, 573 (Tex. Crim. App. 2005). However, evidence of a defendant's diminished capacity may be admissible to negate the mens rea element of an offense. *Id.* at 573–74. Diminished capacity evidence that does not truly negate the mens rea may be excluded. *Ruffin v. State*, 270 S.W.3d 586, 596 (Tex. Crim. App. 2008).

In this case, the State filed a motion in limine requesting that Appellant be required to establish the admissibility of any diminished capacity evidence outside the jury's presence before bringing it to the jury's attention. The trial court granted the motion. After the State rested its case, Appellant asked that she be allowed to present diminished capacity evidence to negate the mens rea element. The trial court ruled that Appellant must approach the bench before mentioning such evidence. Appellant asserted that almost all of her witnesses would testify regarding her diminished capacity. The trial court allowed Appellant to make an offer of proof outside the jury's presence.

In her offer of proof, Appellant proffered various documents and testimony related to her background and mental functioning. Sharon Eubanks is a former contract worker for the state who worked with Appellant's family when Appellant was a child. Eubanks testified regarding the appalling conditions in which Appellant was raised and provided her case notes. Defense counsel believed that Appellant's oldest sister and Appellant's former stepfather, Ezra Jones, would also testify regarding Appellant's abysmal childhood. Betts would testify that she herself has no mental health issues. However, much of the remainder of her testimony would support the belief that she does.

Jones would additionally testify that after he left Betts, Appellant was adopted by another couple and eventually came to live with him and his new wife, Melia Jones. Melia would testify

that Appellant had difficulty answering questions and following instructions. She suspected Appellant needed special education classes, which the school confirmed. Melia also procured counseling for Appellant's anger issues.

Appellant proffered her special education records, mental health records, a letter from her counselor, a competency report, and a report from Dr. Timothy Proctor stating that she is intellectually disabled. Dr. Joan Mayfield and Dr. Theresa Vail testified that they also evaluated Appellant and she met the criteria for intellectual disability. Additionally, Appellant proffered her employment records, a child protective services intake report from five months before the murder, and a police report regarding a verbal disturbance eleven days before the murder.

The trial court found that the entirety of Appellant's proffer "tends to prove that [Appellant] has diminished capacity, which . . . is, under current Texas law, not an authorized defense." Consequently, the trial court excluded the entire proffer. At trial and on appeal, Appellant asserts that this evidence negates the mens rea element of capital murder. However, none of the evidence supports a finding that Appellant did not intentionally and knowingly kill Victoria. This is not a case in which the defendant did not know she was killing someone, or did not know who she was killing. *Cf.* **Ruffin**, 270 S.W.3d at 594 (evidence that defendant thought he shot at Muslims instead of police officers admissible to negate mens rea of aggravated assault on a public servant, but not aggravated assault). The evidence overwhelmingly shows that Appellant knowingly and intentionally killed her four-year-old daughter.

We agree with the trial court and the State that the proffered evidence tends to support a diminished capacity affirmative defense, if such were available, but does not negate the mens rea element in this case. Therefore, we conclude that the trial court did not abuse its discretion in excluding the evidence. *See **id.*** at 596.

Furthermore, to the extent that Appellant asserts she has a constitutional right to a diminished capacity affirmative defense, she makes no argument and cites no authority supporting her assertion. Thus, we likewise grant no relief on that basis. Accordingly, we overrule Appellant's second issue.

## CRUEL AND UNUSUAL PUNISHMENT

In Appellant's third and fourth issues, she argues that because of her intellectual disability, her mandatory sentence of life without parole constitutes cruel and unusual

punishment under the U.S. and Texas Constitutions.[3]  In support of her argument, Appellant cites *Miller v. Alabama*, in which the U.S. Supreme Court held that mandatory life without parole for a defendant who was under the age of eighteen at the time of the offense violates the Eighth Amendment.  567 U.S. 460, 465, 132 S. Ct. 2455, 2460, 183 L. Ed. 2d 407 (2012).  Appellant contends that although she was twenty-five years old at the time of the offense, she has "the mind of a 12 year old," and therefore, like the juveniles in *Miller*, is entitled to have the judge or jury hear mitigating evidence before imposing life without parole.

Although some of the reasoning behind the Court's decision in *Miller* might apply to intellectually disabled defendants as well as it does to juveniles, significant portions of the reasoning do not. These reasons include that (1) juvenile offenders have greater prospects for reform than adult offenders, (2) the character of juvenile offenders is less well formed and their traits less fixed than those of adult offenders, (3) recklessness, impulsivity, and risk taking are more likely to be transient in juveniles than in adults, (4) a sentence of life without parole is harsher for juveniles than adults because of their age, and (5) a sentence of life without parole for juveniles is akin to a death sentence because of their age.  *Id.* 567 U.S. at 471–75, 132 S. Ct. at 2464–66.  We know of no reason to believe that these factors apply to intellectually disabled offenders.  We conclude that Appellant's right to be free from cruel and unusual punishment was not violated by the imposition of a life sentence without parole absent a punishment hearing.  Accordingly, we overrule Appellant's third and fourth issues.

## MOTION TO SUPPRESS

In Appellant's fifth issue, she argues that her statements to the police should have been suppressed because she did not knowingly waive her Fifth and Sixth Amendment rights.

---

[3] *See* U.S. CONST. amend. VIII; TEX. CONST. art. I, § 13.

We note that Appellant preserved this complaint by a timely challenge in the trial court.  *See* TEX. R. APP. P. 33.1.

We further note that there is no significant difference between the protections afforded by the U.S. and Texas Constitutions regarding cruel and unusual punishment.  *See* *Cantu v. State*, 939 S.W.2d 627, 645 (Tex. Crim. App. 1997).

## Standard of Review and Applicable Law

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Hubert v. State*, 312 S.W.3d 554, 559 (Tex. Crim. App. 2010); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). A trial court's decision to grant or deny a motion to suppress is generally reviewed under an abuse of discretion standard. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). We give almost total deference to a trial court's determination of historical facts, especially if those determinations turn on witness credibility or demeanor, and review de novo the trial court's application of the law to facts not based on an evaluation of credibility and demeanor. *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008). When deciding a motion to suppress evidence, a trial court is the exclusive trier of fact and judge of the witnesses' credibility. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). Accordingly, a trial court may choose to believe or disbelieve all or any part of a witness's testimony. *See State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

When a question is raised as to the voluntariness of a defendant's statement, the trial court must make a finding after a hearing outside the presence of the jury regarding whether the statement was made under voluntary conditions. TEX. CODE CRIM. PROC. ANN. art. 38.22 § 6 (West 2018). If the trial court finds that the statement was voluntary and admissible as a matter of law and fact, it must enter an order stating its conclusion and finding of facts upon which the conclusion was based. *Id.*

The determination of whether a confession is voluntary is based on an examination of the totality of the circumstances surrounding its acquisition. *Armstrong v. State*, 718 S.W.2d 686, 693 (Tex. Crim. App. 1985). Relevant circumstances to determine if a defendant's will has been overborne include length of detention, incommunicado or prolonged interrogation, denying family access to the defendant, refusing the defendant's request to telephone a lawyer or family, and physical brutality. *Id.* The totality of the circumstances standard of review for evaluating the voluntariness of confessions applies equally to defendants with all levels of mental capacity. *Delao v. State*, 235 S.W.3d 235, 241 (Tex. Crim. App. 2007).

The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966). Custodial interrogation means

8

questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Id*.

In determining whether an individual was in custody, the ultimate inquiry is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528-29, 128 L. Ed. 2d 293 (1994) (per curiam). The determination depends on the objective circumstances, not on the subjective views of either the interrogating officers or the person being questioned. *Id.* 511 U.S. at 323, 114 S. Ct. at 1529. The determination is made on an ad hoc basis after considering all of the objective circumstances. *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). Custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest. *Id.*

When a suspect is in custody, the failure to end questioning after she invokes her right to remain silent violates her rights and renders any subsequently obtained statements inadmissible. *Id.* at 257. However, an officer need not stop questioning unless the suspect's invocation of rights is unambiguous, and the officer is not required to clarify ambiguous remarks. *Id.*

## Analysis

The evidence related to Appellant's statements to the police shows that after Appellant murdered Victoria, she put her body in the trunk of the car, left the car at her house, walked the short distance to the Athens police station, and calmly told the dispatcher at the front desk that she would like to turn herself in for the murder of her child. Appellant and the dispatcher had a brief conversation about the locations of the murder scene and the child's body. Officer Charles Hoover overheard the conversation and informed Lieutenant Jeremy Hugghins. Hoover asked Appellant in Hugghins's presence why she was there. She repeated that she was there to turn herself in for killing her child. Hugghins asked Appellant whether she was there of her own free will and whether she had any mental illness. She replied that she was there of her own free will and had no mental illness. Hugghins informed Detective Sergeant Don Yarbrough of the situation. Yarbrough in turn informed Detective Christopher Saylors, and the two of them went into an interview room with Appellant.

Before conducting the interview, Sergeant Yarbrough told Appellant that they had to read her rights. Appellant responded, "I don't mind. I am a hundred percent guilty." Detective

Saylors read the warnings from a card and asked whether Appellant understood. She said that she did. Saylors asked whether Appellant was willing to waive her rights and speak with them. She said that she was. Yarbrough asked whether Appellant knowingly, intelligently, and voluntarily wanted to waive her rights and talk with them. Appellant responded, "'Do you want to speak to me,' is that what you're asking?" Yarbrough said yes, and Appellant said, "Yes, I'd like to speak with you." Yarbrough asked Appellant to read her rights again from a document, then initial and sign it. In the video, Appellant appears to read each right and initial and sign the document. Appellant then confessed the murder in detail. She did not appear reluctant, but rather eager to answer every question.

Based on information obtained in the interview, the police believed that the murder occurred outside the city limits. Accordingly, a short time later, Henderson County Sheriff's Investigator John Long arrived to interview Appellant. Before the interview, Long told Appellant her rights again one at a time. Appellant said that she understood each right and freely proceeded to confess the murder to Long.

Later that day, after the crime scene was processed and Appellant was arrested, Investigator Long interviewed Appellant again to obtain additional information about the weapons used in the assaults. Long read Appellant her rights again, and she said she understood each one. In the audio recording, Appellant sounds extremely willing to answer Long's questions. At the end of the interview, Long asks Appellant whether there is anything else he needs to know. Appellant replies, "No, you've heard everything that you are going to hear again in the court. And I'm going to say, 'Yes, yes, yes, yes, yes, I'm guilty. Take me to prison, please.'"

A few days later, Investigator Long conducted a final interview with Appellant to obtain more information about the object she used to stab Victoria because he was still trying to locate it. He read her rights again, and she again eagerly agreed to speak with him. During the interview, Appellant asked Long whether he knew anything about the State seeking to send her to "death road" as her attorney mentioned. She stated that she was "very terrified" of dying, and that she wanted to "get help," pay her bond, and go live with her mother. Appellant said that her attorney told her not to talk about the case, and asked Long whether it was wrong to do so. Long replied, "No, it's totally up to you. It's your choice. If you don't want to talk to me without your attorney, you don't have to. But that's why I read you those rights each time and make sure

10

you're aware of them. You know what I mean?" Appellant said that she did and continued to talk freely.

On appeal, Appellant argues that her statements to the police were involuntary because (1) she made some of the statements while in custody and before she was Mirandized, (2) the interrogations were repetitive, (3) her last statement was obtained by coercion because Long said he could help her stay off of "death road," (4) Long ignored her indication that her attorney advised her not to talk to the police, her question of whether it was wrong to talk to him, and her question of whether he would tell her attorney that she talked to him, and (5) she is intellectually disabled and failed to appreciate the seriousness of the situation. We disagree.

First, the record does not support a conclusion that Appellant was in custody before she received her *Miranda* warnings. The evidence shows that when she informed the dispatcher that she wanted to turn herself in for murder, no one in law enforcement was aware that a crime had been committed. The few follow up questions by the dispatcher, Officer Hoover, and Lieutenant Hugghins were basic questions designed to determine whether there was a crime. No evidence shows that there was a restraint on Appellant's freedom of movement to the degree associated with a formal arrest at that time. *See Stansbury*, 511 U.S. at 322, 114 S. Ct. at 1528–29. Therefore, we conclude that the record supports the trial court's implied finding that Appellant was not in custody before she received her *Miranda* warnings. *See Neal*, 256 S.W.3d at 281.

Second, Appellant cites no authority for the proposition that repetitive interrogations render a confession involuntary. *See* TEX. R. APP. P. 38.1(i) (requiring brief to contain clear and concise argument with appropriate citations to authorities). Consequently, we conclude that this argument is without merit.

Third, the record does not support Appellant's contention that Investigator Long coerced her by saying he could help her stay off of death row. Nothing in the video and audio recordings of Long's interviews can be construed as such a statement. To the contrary, at the end of the last interview, Appellant states that she wants to know what is going to happen to her. Long replies, "To be honest with you, that's not up to me."

Fourth, the record does not support Appellant's assertion that Investigator Long ignored her indication that her attorney advised her not to talk to the police. After Appellant mentioned that her attorney said the State was going to seek the death penalty, she stated, "I mean, you wouldn't say anything, would you? He doesn't want me talking about the case." She then

11

continued to talk about wanting to get help, pay her bond, and go to live with her mother. When she finally paused, the following exchange occurred:

LONG:        And you did talk to your attorney yesterday?

APPELLANT:   Yeah.

. . . .

LONG:        And they told you not to talk about it?

APPELLANT:   They told me not to talk about it.

LONG:        But you understood your rights when I just read them to you?

APPELLANT:   Yes! Yes you did.

LONG:        And you still wanted to talk? And answer some questions?

APPELLANT:   Yes. I mean, is that a wrong thing?

LONG:        No, it's totally up to you.

APPELLANT:   Okay.

LONG:        It's your choice. If you don't want to talk to me without your attorney, you don't have to. But that's why I read you those rights each time and make sure you're aware of them. You know what I mean?

APPELLANT:   Yes, I do.

Appellant then continued talking about the crime and what was going to happen to her. Thus, the record shows that Long did not ignore Appellant's statement, but rather took steps to confirm that she understood her rights and wanted to talk to him anyway.

Finally, the record does not support Appellant's argument that her statements were involuntary because of her intellectual disability. In support of this argument, Appellant asserts that she failed to understand the seriousness of the situation. However, the evidence shows otherwise. She walked to the police station of her own volition and announced that she wanted to turn herself in for murder. She indicated that she knew she would go to prison and wanted to go to prison.

We acknowledge that Appellant appeared to become upset when she learned the State might seek the death penalty, and that this tends to show she did not know all of the possible consequences of her actions. However, Appellant cites no authority for the proposition that a

suspect's unawareness of a punishment range renders her confession involuntary. *See* Tex. R. App. P. 38.1(i). Therefore, this evidence does not support a finding that her confession was involuntary.

Appellant further asserts that she did not understand her rights. She claims she told Investigator Long that she did not understand her rights and "that he could warn her again but she would just forget." We find no evidence in the record that Appellant told Long she did not understand her rights. At the beginning of Long's third interview, the following exchange occurs:

LONG:           I've got a couple more [questions].

APPELLANT:    All right.

LONG:           Would you mind trying to help me out?

APPELLANT:    All right, sure!

LONG:           Okay. You know the rules. I got to read you your rights again, okay? You probably know them verbatim by now, huh?

APPELLANT:    No, I don't.

Long then reads the warnings one at a time, and Appellant says that she understands each one. The exchange continues as follows:

LONG:           Do you understand your rights?

APPELLANT:    I do now. I'm still going to forget them. But you can tell me all the time you want.

LONG:           Even though you know your rights, do you wish to speak with me and try to help me out?

APPELLANT:    Yes! What do you need to know?

Appellant then freely answers Long's questions. This evidence supports a finding that Appellant understood her rights even though she did not know them verbatim.

Appellant further argues that if she understood the warnings, she would not have asked Investigator Long whether it was "wrong" to talk to him. We disagree. There is a distinction between understanding one's rights and making a wise decision based on that understanding.

*See* ***Hall v. State***, 303 S.W.3d 336, 342 n.8 (Tex. App.—Amarillo 2009, pet. ref'd) ("In the context of waiver of rights, an 'intelligent' waiver is not the same thing as a 'wise' decision to forego a right."). Here, the fact that Appellant asked Long whether it was "wrong" to talk to him tends to show that she knew she had a choice, although she perhaps had some doubt regarding whether she was making the right choice. We conclude that the record supports a finding that Appellant's statements were voluntary regardless of any intellectual disability she may have.

In the trial court's written order denying Appellant's motion to suppress, it found

> that the Defendant was under no discomfort or duress in the making of such statements, from the State or otherwise; was aware that making such statements carried grave consequences and made them intending to suffer grave consequences; that Defendant was apprised of her right to remain silent and her right to counsel and knowingly and voluntarily waived same; and that her statements were freely and voluntarily given.

Based on our examination of the totality of the circumstances surrounding the confession, we conclude that the trial court did not abuse its discretion by finding that Appellant's statements were voluntarily made and denying her motion to suppress. *See* ***Armstrong***, 718 S.W.2d at 693. Accordingly, we overrule Appellant's fifth issue.

## DISPOSITION

Having overruled Appellant's first, second, third, fourth, and fifth issues, we ***affirm*** the trial court's judgment.

**BRIAN HOYLE**
Justice

Opinion delivered July 31, 2018.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

14



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

JULY 31, 2018

NO. 12-16-00330-CR

**STACY MARIE PARSONS,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 173rd District Court
of Henderson County, Texas (Tr.Ct.No. A-21,538)

THIS CAUSE came to be heard on the oral arguments, appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*